[Crim. No. 2787. In Bank.—October 11, 1926.]

THE PEOPLE, etc., Respondent, v. RAY ARNOLD and EDWARD K. SAYER, Appellants.

[1] CRIMINAL LAW—MURDER—ALIBI—EVIDENCE.—In this prosecution for murder, it is held that the evidence on the alibi asserted by the defendants was not sufficient to create a reasonable doubt as to the guilt of the defendants.

[2] ID.—TIME RECORDS—INADMISSIBILITY OF MEMORANDUM.—In such a case, where a witness made no note of the time that he saw the defendants on the day of the homicide and had no recollection of the time and was only able to testify to the hour by accepting certain entries on time records made on certain cards and slips of paper by another person, these memoranda were not admissible in evidence under section 2047 of the Code of Civil Procedure.

[3] ID.—OPENING STATEMENT—NATURE OF—RIGHT TO MAKE.—There is no provision of law which compels the district attorney to make an opening statement in a criminal action, but he has the right to do so, and its office is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect.

---

2. See 27 Cal. Jur. 90.
3. See 8 Cal. Jur. 259.

[4] ID.—MISCONDUCT OF DISTRICT ATTORNEY.—It is only in cases where the conduct of the district attorney in making his opening statement is flagrantly improper or works a legal prejudice against the defendant that the appellate court would be justified in reversing the judgment on that ground.

[5] ID. — EVIDENCE — OTHER OFFENSES. — The principle that evidence tending to connect a defendant with the commission of other crimes is admissible if there be a rational connection between the offenses or crimes sought to be charged and the main charge, if it fairly appears that in the commission of said crimes the participants acted in concert pursuant to a well-prepared scheme to engage in the commission of a series of crimes upon a definite, specific criminal enterprise, is settled law.

[6] ID.—HOMICIDE IN ATTEMPT AT ROBBERY—INTENT.—In a prosecution for murder, proof of intent, deliberation or premeditation on the part of the slayers to commit murder of the first degree is not necessary where the evidence shows that the homicide was committed by one of the participants in the perpetration of or attempt to commit robbery.

[7] ID.—OTHER OFFENSES—STATEMENT OF DISTRICT ATTORNEY.—In a prosecution for murder, the defendants were not legally injured by the district attorney's statements as to the commission of other offenses by the defendants, where the court ruled out evidence as to other crimes and admonished the jury on several occasions during the trial and at its conclusion not to consider any reference made by the district attorney to any other crime or crimes than the one charged.

[8] ID.—FICTITIOUS REGISTRATIONS AT HOTELS.—In such a case, evidence showing false or fictitious registrations by the defendants at certain hotels was admissible, where it was a part of the plan adopted to avoid detection in the commission of the crime.

[9] ID.—PREPARATION FOR CRIME.—Evidence which tends to show preparation looking to the commission of a crime, as well as acts and circumstances in pursuance of its accomplishment, such as, concealment of identity, clandestine movements on the part of the accused and plans laid for escape from the scene of the crime, is admissible against one charged with crime.

[10] ID.—MEETING OF DEFENDANTS—CIRCUMSTANCES OF.—The meeting of persons prior to the commission of a crime of which they are charged, and the circumstances thereof, may be relevant to the

4.  See 8 Cal. Jur. 260.
5.  See 8 Cal. Jur. 71; 9 R. C. L. 200.
6.  See 13 Cal. Jur. 600; 13 R. C. L. 848.
9.  See 8 Cal. Jur. 38.

acts of preparation and concert of action, and, therefore, may be properly brought to the attention of the jury.

[11] ID.—OPENING STATEMENT—ALLEGED PREJUDICIAL ERROR.—In such a case, a reference by the district attorney in his opening statement to the jury, as to what he expected to prove, to a conversation between the three defendants and the wife of one of them in which the latter asked her husband why, if he had money to put up for a suggested party, he did not pay alimony which he owed for the support of their child, could not have prejudiced the defendants, where the court of its own motion withdrew from the jury's consideration all references made to unpaid alimony, holding them to be immaterial, and instructing the jury to disregard them.

[12] ID.—EXAMINATION OF WITNESSES—PREJUDICIAL METHOD.—In a prosecution for murder, where a hotel proprietor, called as a witness for the prosecution, had previously told the district attorney that two men, claimed by the prosecution to be two of the defendants, had registered at the witness' hotel sometime after midnight after the day of the murder, and he described them as being nervous men and said they impressed him as being "bad men," but upon the stand the witness' testimony fell short of the statements he had made to the district attorney, questions by the district attorney embodying alleged previous statements of the witness to him were not sufficiently prejudicial to the defendants to justify a reversal of the case, where on cross-examination the witness completely destroyed the effect of his testimony in failing to identify the defendants as the men whom he thought were "bad men."

[13] ID.—STATEMENTS OF DEFENDANT—SIGNATURE TO CONTRACT.—In a prosecution for murder, the testimony of the father of one of the defendants as to alleged statements made by his son to him shortly after the homicide, and to identify said defendant's signature to an automobile sales contract, under which the latter purchased an automobile which was found abandoned on the highway a short time after the homicide, was admissible.

[14] ID.—APPEARANCE OF DEFENDANT.—In such a case, evidence of the appearance and manner of a defendant three hours after the commission of the homicide was admissible relative to consciousness of guilt, its weight, effect and sufficiency being solely a matter for the jury's consideration.

[15] ID.—DEATH OF ONE DEFENDANT—EVIDENCE OF PARTICIPATION IN CRIME.—The fact that one of three parties alleged to have committed a murder was not on trial, or was not even alive at the time of the trial of the others, did not foreclose the prosecution from showing his participation in the crime; and evidence show-

---

14. See 8 Cal. Jur. 42; 8 R. C. L. 191.

ing the means of his escape, the route taken by him on his flight and every incriminating act done by him, as well as any evidence of the crime that may have been found upon his person, was admissible even though he was dead at the time of the trial.

[16] ID.—OPENING STATEMENT—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY.—In a prosecution for murder alleged to have been committed by three persons, one of whom was dead at the time of the trial of the others, the statement by the district attorney in his opening statement that he expected to show that the deceased made certain incriminating statements to his father and sister-in-law after the murder, was not prejudicial misconduct, where the testimony of the father offered by the prosecution afterward was excluded by the court and the jury repeatedly admonished to disregard the statements of the district attorney as to any conversations which he claimed took place between the deceased and his father.

[17] ID.—CONNECTION OF DEFENDANTS—EVIDENCE.—In such a case, where the shooting of the murdered person by the deceased accused was not seriously questioned, any legal evidence tending to connect the other defendants with the latter was material and relevant, and a properly identified photograph of him was admissible.

[18] ID.—EFFORTS TO ESCAPE—CONSCIOUSNESS OF GUILT.—In such a case, testimony of the jailer and others who heard sounds emanating from cells occupied by the defendants and another prisoner, pending trial, the finding of fresh cuts upon the cell bars immediately thereafter, and the location of about a dozen saws concealed in a box to which the defendants had access, was properly admitted as tending to show a consciousness of guilt.

[19] ID.—INSTRUCTIONS—LACK OF ERROR.—In this prosecution for murder, it is held that the instructions when considered as a whole cannot be said to contain infirmities which deprived the defendants of a fair and impartial consideration of the case by the jury.

[20] ID.—REASONABLE DOUBT.—In a prosecution for murder, instructions on the subject of reasonable doubt should be expressed in the language that has been frequently approved by the supreme court, and no enlargement upon them should be attempted.

[21] ID.—REASONABLE DOUBT—PROOF OF GUILT.—In such a case, an instruction that proof of guilt beyond a reasonable doubt "means that the evidence must be such that it will satisfy the mind,

17.   See 13 Cal. Jur. 690.
18.   See 8 Cal. Jur. 45.
19.   See 8 Cal. Jur. 362.

conscience and judgment of the juror, and satisfy him of the guilt of the party to a moral certainty and beyond this reasonable doubt," is proper.

[22] ID.—PRINCIPALS IN CRIME—INSTRUCTION—HARMLESS ERROR.— In such a case, an error in an instruction in using the word "or" instead of "and" in the phrase "aid *and* abet its commission," contained in section 31 of the Penal Code defining principals in crime, was cured by a specific, concrete instruction on the subject immediately following it, in which the word "and" was placed in its proper order.

[23] ID.—SUPPRESSION OF EVIDENCE—INSTRUCTIONS—FAILURE OF DE-FENDANT TO TAKE STAND—LACK OF ERROR.—In a prosecution for murder, an instruction under section 1963, subdivision 5, of the Code of Civil Procedure, to the effect that if the jury should find that the defendants had *wilfully* suppressed evidence, in the absence of proof negativing the presumption, it should consider that such evidence, if produced, would have been adverse to the defendants, could not have been regarded by the jury as equivalent to stating that the failure of the defendants to take the stand and testify was a suppression of evidence and raised the presumption that had they done so their testimony would have been adverse to their case.

[24] ID.—PUNISHMENT—DISCRETION OF JURY—INSTRUCTIONS.—In a prosecution for murder, no suggestion should be made in the instructions by the court which might be regarded as a limitation upon the jury's right to exercise unimpaired its discretion in determining whether the defendants should suffer death or be imprisoned in the state prison for life.

[25] ID.—ALIBI—INSTRUCTIONS.—In this prosecution for murder it is held that there was no error in the instructions as given by the court upon the subject of alibi.

(1) 16 C. J., p. 777, n. 89. (2) 16 C. J., p. 745, n. 28. (3) 16 C. J., p. 889, n. 32, 42. (4) 17 C. J., p. 298, n. 21. (5) 16 C. J., p. 591, n. 33. (6) 29 C. J., p. 1097, n. 59. (7) 16 C. J., p. 919, n. 70. (8) 16 C. J., p. 545, n. 89. (9) 16 C. J., p. 545, n. 87. (10) 16 C. J., p. 651, n. 36. (11) 17 C. J., p. 299, n. 31. (12) 17 C. J., p. 308, n. 59. (13) 30 C. J., p. 162, n. 72. (14) 30 C. J., p. 209, n. 62. (15) 30 C. J., p. 200, n. 38. (16) 16 C. J., p. 890, n. 46. (17) 16 C. J., p. 744, n. 11; 30 C. J., p. 164, n. 52. (18) 16 C. J., p. 554, n. 94, 95. (19) 16 C. J., p. 1050, n. 84. (20) 16 C. J., p. 989, n. 92. (21) 16 C. J., p. 984, n. 27. (22) 16 C. J., p. 1050, n. 84. (23) 16 C. J., p. 1022, n. 61. (24) 30 C. J., p. 425, n. 86, 87. (25) 16 C. J., p. 977, n. 52.

23. See 8 Cal. Jur. 358.
24. See 13 Cal. Jur. 745.

APPEAL from judgments of the Superior Court of Placer County and from orders denying new trial. J. B. Landis, Judge. Affirmed.

The facts are stated in the opinion of the court.

K. D. Robinson, Ralph H. Lewis and George A. Connolly for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

SEAWELL, J.—By an information filed against them on the twenty-ninth day of November, 1924, by the district attorney of the county of Placer, Ray Arnold and Edward K. Sayer were jointly accused of the crime of murder, it being alleged therein that they did on the fifth day of November, 1924, in said county of Placer, this state, unlawfully and with malice aforethought kill a human being, to wit, Tamae Ninomiya. Arthur H. Muller, who fired the fatal shot, as will hereafter appear, was never arrested or informed against, as his dead body was identified in San Francisco on the day following the murder. The defendants entered separate pleas of not guilty, went to trial thereon and the jury returned a simple verdict of guilty of murder of the first degree against them. The court, pursuant to the laws of this state, was required to and did pronounce a judgment imposing the death penalty upon each of said defendants. An appeal from said judgments and the court's orders denying the motions of defendants for a new trial was taken to this court and said judgments and orders were affirmed. Thereafter a petition to this court for a rehearing of said cause was granted and the appeal is again before us for decision after reargument by respective counsel.

Appellants have specified many errors committed by the trial court by rulings made in the admission and rejection of evidence. Misdirections of the court in matters of law in its charge to the jury; misconduct upon the part of the district attorney so grave in its demeanor as to have deprived the defendants of a fair trial, and the insufficiency of the evidence to support the judgments are also urged as reasons which should compel the granting of a new trial.

The district attorney, in his opening statement in outlining his theory of the case and the facts he expected to prove, stated to the jury, against the vehement protest of counsel for the defendants, that he would show a general plan, system, scheme and conspiracy upon the part of the defendants and Muller to make a continuous trip with the use of automobiles into the outlying districts of the San Joaquin and Sacramento Valleys and there to commit a series of robberies upon merchants and tradespeople of the Japanese race. As a part of and in furtherance of the execution of the general plan and purpose as agreed upon and outlined by said defendants and Muller, the district attorney offered to show five or six robberies or attempted robberies of Japanese suburban merchants and dealers committed successively by the defendants, beginning November 2d and ending in murder November 5th. The evidence offered by the district attorney as tending to establish the conspiracy outlined by him was objected to on the ground that such evidence merely had a tendency to connect the defendants with the commission of other independent, isolated crimes which in no way tended to connect them with the crime charged against them. The court, being doubtful as to the admissibility of this class of evidence, ruled that it was not admissible. The correctness of this ruling will be considered at a later period.

The evidence upon which the defendants were convicted consists of both positive or direct evidence and circumstantial evidence. Either considered without reference to the other makes out a strong case against the defendants, and when both are considered together there would seem to have been left little room for the existence of a reasonable doubt on the part of the jury as to the identity of the defendants with the commission of the murder charged, which was committed in the perpetration of an attempt to commit robbery, and is, therefore, declared by section 189, Penal Code, to be murder of the first degree.

The material and outstanding facts in the case which tend to connect the defendants with the murder charged against them, as disclosed by the record, may be summarized as follows:

Ray Arnold, Edward K. Sayer, frequently addressed by his associates as ''Eddie,'' and Arthur H. Muller, three

young men whose ages do not appear as matters of record, were unquestionably associates, if not intimates, on and prior to November 1, 1924, and all of them were then residents of the city of San Francisco. Very little appears of record as to the antecedents or as to the mode or manner of life of said persons, except it is shown that Arnold formerly lived in Sacramento, where his father resided, and that while living there he worked as an automobile mechanic for Arnold Brothers, who are his uncles and who are dealers in automobiles and conduct automobile repair-shops. Sayer, it seems, was or had been the driver of a bus (presumably a motor-bus) in the city of San Francisco and Muller was a frequenter at the Reo Motor Company's place of business in San Francisco and was well acquainted with at least one of its employees, H. E. Buckner. Covering several days beginning a few days immediately prior to November 1, 1924, Arnold, who was the owner of a new-appearing four cylinder Essex coach, was at said Reo Motor Company's place of business as often as four or five times a day in close conversation with Muller. On October 31, 1924, Muller purchased on a sales contract a used Essex touring car from Louis Casalini, upon which he paid down two hundred dollars and agreed to pay the balance in monthly installments. Both Arthur H. Muller and the seller, Casalini, signed the contract. The state license number which the car bore was 579,907. Arnold brought Muller and Casalini together and assisted in negotiating the sale. The uncontradicted testimony of Buckner is that Arnold, at about the time he was making frequent calls upon Muller at the Reo Motor Company's place of business, furnished Muller with one hundred dollars to apply upon the purchase of a car. On the afternoon of November 1st Muller borrowed from Buckner an automobile tire, size 31-3-75, upon which Buckner, in order to distinguish it from the stock supplies belonging to his employer, wrote or marked his name, "Buckner." This tire would not fit Muller's Essex touring car, but would fit Arnold's Essex coach. Arnold and Sayer admitted they left San Francisco on the first or second day of November in Arnold's Essex coach, but each persistently denied at all times that he had seen Muller since he left San Francisco, or at any time during their five days' trip into the Sacramento valley. The defendants made contradictory statements as to

the purposes of their trip into the country, having stated upon one occasion that it was just a "pleasure trip," and upon another that they made a trip into Stockton in quest of liquor,   and again that Ray Arnold had ordered tires from Arnold Brothers' Company at Sacramento which had not been received at San Francisco and that Arnold was investigating the delay in delivery.   That the three men left San Francisco on the night of November 1st or the morning of November 2d, Arnold and Sayer in the Essex coach and Muller in the Essex touring car which Arnold helped to purchase, with an understanding as to the next place of meeting, there can be no reasonable doubt.

The first witness called to prove the commission of a robbery in the line of common plan and agreement as outlined was a Japanese fish dealer doing business at a small place known as Florin, near Sacramento.   Upon the witness being asked as to the presence of either of the defendants at his place of business on November 2d, an objection was interposed by the defendants and, after much argument in the absence of the jury, the objection was sustained by the court on the theory that such evidence might tend to connect the defendants with another crime.   Another Japanese witness identified Arnold, Sayer and Muller—the latter by his photograph used at the trial—as the three men who came to her place, located in a small community known as West Sacramento, on November 2d.   No other witnesses were offered by the prosecution, in view of the court's ruling, to show the commission of other crimes similarly executed, and, as the prosecution claimed it was able to show, an alternating plan whereby one man remained at the steering wheel of the automobile while the other two, in turn, entered stores and with drawn revolvers terrorized the persons in charge into submission.

A Japanese groceryman identified Arnold as one of two men who entered his store situate in South Sacramento about 10 A. M. November 4th.   Sayer was not the person who entered the store with Arnold.   A soiled handkerchief was left near the cash register by the "other" man.   The wife of this witness also identified Arnold as one of two men who entered her husband's store.   She declared, as did her husband, that Sayer was not the other man.   She

described the other man as a "little big." Muller, the evidence shows, was the tallest of the three.

The evidence without contradiction further shows that Muller on November 2d appeared unheralded, driving an automobile, at the home of an elderly lady residing at Stockton, within whose home he had resided as a youth, and remained all night with his old friend, and was called upon by Arnold and Sayer on the following morning. Both were positively identified at the trial by the lady as the men who called upon Muller while he was a guest at her home. · Arnold was driving the car which he and Sayer occupied. Muller, Arnold and Sayer held an extended conversation in Arnold's car without the hearing of the witness. Arnold and Sayer soon departed and Muller visited them at least twice in their room at the Marion Hotel in Stockton. The hotel proprietor, who saw Muller twice as he visited Arnold and Sayer at his hotel, identified a photograph used at the trial as the photograph of the man who visited Arnold and Sayer at their rooms. Arnold and Sayer paid their bill in advance and left the hotel unobserved. Arnold signed the hotel register for both, but the names which he wrote upon the register were kept from the jury upon defendants' objection. Muller left the place at which he was stopping early on the morning of November 4th.

The murder was committed in a store situated in the Japanese quarters of Penryn, Placer County, commonly referred to by the witnesses as Yamanaka store, which seems to have been managed by Saichi Ninomiya and his deceased wife, Tamae Ninomiya. Penryn is twenty-nine or thirty miles distant from the city of Sacramento.

On the afternoon of November 5th, the exact time being variously estimated by the Japanese witnesses at 4:05, 4.10 and 4:15 o'clock, an Essex touring car, according to said witnesses, containing three persons, drew up and was parked in front of the Yamanaka store. A Japanese barber, named Fujimoto, was sitting on the sidewalk near where the car was stopped and a Japanese named Ikeda was standing in front of said store. Two men stepped from the automobile and entered the store, while the third remained at the wheel of the automobile. Ikeda was carrying in his arms his infant child. As the men entered the store, Ikeda

followed them. Mrs. Ninomiya was alone in the store engaged in writing a letter. Ikeda had gone but a little way into the store when Sayer drew a pistol and leveled it upon him, and at the same time Muller drew a pistol upon Mrs. Ninomiya. Muller ordered Mrs. Ninomiya to stand by Ikeda, but instead she attempted to escape from the store by the rear door, and when within a few feet of the exit she was shot through the body by Muller and soon thereafter expired. Ikeda fled from the store, giving an alarm by crying "hold up" as he reached the street. Both men left the store by the front entrance and jumped into the waiting automobile and were soon speeded away by Arnold, who was at the wheel. Neither of the men who entered the store wore masks or were disguised in any way. Fujimoto, alarmed by the cry of Ikeda, drew near to the automobile into which the two entered, making some sort of a demonstration. He saw the men as they arrived and also as they departed. He testified that he was positive in his identification of Arnold and Sayer, while Ikeda was likewise positive as to Sayer, who had held him at bay in the store, and also as to Muller, whose dead body he viewed in San Francisco two days after the murder.

A fruit-raiser whose property adjoins the Japanese quarters was at work in his field at a point about forty feet from the highway on November 5th. He testified that at about the hour of 3:45 or 3:50 P. M. he saw an Essex coach pass along the highway traveling at a very high rate of speed toward Penryn. He was sure he observed two men in the coach. Within three or four minutes the coach returned, traveling very fast. Another car in front of it, also traveling very fast, was passed by the coach. His view was somewhat interrupted by intervening objects and he was not able to obtain a continuous view for more than a few moments at a time. He said it was traveling too fast for him to tell whether it was a four or six cylinder car. He also thought the car had disc wheels. The witness was of the impression that the two men in the coach occupied the front seat.

Late on the afternoon of November 5th an abandoned Essex four cylinder touring car was discovered at the side of the highway leading out of Penryn at a distance of about

one mile and a half therefrom. It was the car which Muller had purchased, with the aid of Arnold, from Casalini six days prior to the murder, and it carried the same license plates that were on it at the time Muller purchased it from Casalini. A soiled rag was wrapped about the front plate in such a manner as to conceal the first two figures of the license plate and the rear license plate was bent in such fashion as to conceal the first three numbers thereon.

Arthur H. Muller appeared at his father's residence in Sacramento about 7 o'clock on the evening of the murder. On the following day he was dead in San Francisco. Detective Sergeant Gregson of the San Francisco police department placed both Arnold and Sayer under arrest on November 6th. Arnold was found at about 2 o'clock P. M. in front of a Leavenworth Street apartment house at which he was living, cleaning his Essex coach. He said he arrived in San Francisco on the first boat from Vallejo. Upon his tire-rack was found the tire which Muller had borrowed from Buckner on November 1st and upon which Buckner's name was written. Arnold admitted his trip into the country with a fellow called "Eddie," but denied that he knew his surname or his place of residence. After continued questioning by the officer he told him that his companion on the trip was Edward Sayer and accompanied the officer to the latter's residence. Sayer admitted his acquaintance with Muller, but denied that he had seen him since the day before he and Arnold left San Francisco. Sayer stated to the officer that Arnold did not take him to his door on the return trip, but let him out of the car about two blocks from his residence.

Neither one of the defendants took the witness-chair in his own behalf and the evidence as herein summarized was not directly contradicted or impeached by any witness presented by the defense. The defendants relied upon the defense of alibi, and offered evidence tending to show that that they were not at Penryn at the time fixed by the witnesses called by the People as the time of the commission of the murder, to wit, a few minutes after 4 o'clock, but were at the city of Sacramento, some twenty-nine or thirty miles distant from Penryn and it was physically and geographically impossible for them to have participated in the commission of the crime.

Eight witnesses were called to establish the alibi. Of this number three were blood relatives of the defendant Arnold—uncles; two were employees of one or more of said uncles; one was a close acquaintance of one of said uncles and the other two were employed as barbers in a barber-shop which Arnold was in the habit of patronizing. The two latter testified that Arnold and Sayer left the barber-shop at 12:30 P. M., November 5th, and one of said two employees testified that he saw defendant Arnold at the Arnold Brothers' garage at 5 o'clock P. M. on the same afternoon. Horace Arnold, an uncle, and the acquaintance above referred to, testified that they saw Arnold and Sayer in a restaurant in Sacramento between 2 and 2:30 o'clock P. M. on November 5th, but did not speak with them. The testimony of these five witnesses, standing alone, had no value as alibi evidence. Given full credence, still the defendants would have had ample time and opportunity to have been at the place of the homicide and to have participated in its execution. [1] We have made a careful examination of the alibi evidence offered by the defense—in fact, of all the evidence received in the case—and we feel impelled to say in answer to the earnest and insistent claim of counsel to the effect that the alibi evidence was legally sufficient to raise a reasonable doubt in the minds of reasonable men as to the guilt of the defendants, that the failure of the alibi evidence to impress the jury can reasonably be accounted for upon the theory that it lacked sufficient convincing force to create a reasonable doubt in the minds of the jurors. The other three alibi witnesses who testified that the hour at which Arnold and Sayer were at the Arnold Brothers' place of business was at or very near the time the homicide was committed—according to the time fixed by the Japanese witnesses—estimated the time, as did all the other witnesses called to prove the alibi except one, with reference to the time fixed by an article which appeared in a metropolitan newspaper on November 7th, implicating Arnold in the crime. The newspaper article stated that the homicide was committed at about 4 or 4:15 o'clock on the afternoon of November 5th. The testimony of the witness who comes within the exception above mentioned was given by an employee of Arnold Brothers and the reason assigned by him for looking at his watch at the par-

ticular time he saw Arnold and Sayer, and the reason he gave for the incident impressing him as to the exact time, within one minute, was a matter for the jury's consideration in passing upon the probability of his statements and weighing all his testimony in subordination to the rules of evidence. Thomas Arnold testified that he saw his nephew, Ray Arnold, and Sayer at the garage between 3:30 and 4 o'clock on the afternoon of November 5th. What has been said as to the probability and consistency of witnesses' statements and their relation to the subject matter of the action were matters for the jury's consideration. Arthur G. Arnold testified that his nephew and Sayer were at the shop or garage at 3:53 on the afternoon of November 5th, and, of course, if this be true, they could not have arrived at Penryn, a distance of thirty miles, within the latest period of time fixed by the witnesses for the People as the time the homicide was committed, to wit, 4:15 o'clock. Estimated according to the testimony of some of the witnesses they would have been compelled to travel thirty miles in twelve minutes, and under the estimates of others it would have been necessary for the defendants to have covered thirty miles in seventeen and twenty-two minutes, respectively.

[2] Special emphasis is laid on the ruling of the court excluding from the jury's inspection certain time records which it is claimed, if admitted, would have fixed the time that Arthur G. Arnold met and conversed with Ray Arnold and Sayer at the Arnold Brothers' garage at the hour of 3:53 o'clock P. M., November 5th. The witness made no note of the time he saw the defendants on that day and had no recollection of the time and was only able to testify to the hour by accepting certain entries of time made on certain cards and slips of paper by another person, which purported to give the time that repair work was suspended on the car belonging to the brother of the witness in order to give an employee an opportunity to adjust the carbureter of defendant Arnold's car. No adjustment or other repair work was done on Ray Arnold's car, however, as it was in first-class running condition, at least for fast driving.

We know of no rule of law that would sustain appellants' contention. Section 2047 of the Code of Civil Procedure,

provides that a witness may "refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the *fact* occurred, or immediately thereafter, or at any other time when the *fact* was fresh in his memory, and he knew that the same was correctly stated in the writing. . . . " (Italics supplied.) The *fact* sought to be established was the *time* Arnold and Sayer were at the garage, a fact (the time) about which the witness was absolutely without knowledge and was compelled to rely upon an entry made by a third party, who alone was competent to testify to the correctness of the facts embraced in the entry, but who was not called as a witness nor was his absence accounted for. The only party that was entitled to read the memorandum to the jury was the district attorney. (Sec. 2047, Code Civ. Proc.) Had the witness made the writing, or had it been made under his direction, with a knowledge of the *facts* therein contained, it would have been admissible, even though the facts had passed from his mind. But no such case is before us. All that the witness was entitled to testify to, however, went to the jury. The court, under the circumstances of the offer, did not commit error in excluding the memoranda.

Appellants assign as gross misconduct on the part of the district attorney all references made by him in his opening statement to the jury as to other specific robberies or attempted robberies committed by the defendants in their excursion into the territory invaded by them, beginning November 2d and ending November 5th. In outlining to the jury the facts he expected to prove, he stated that he would show a general plan and agreement on the part of Muller, Arnold and Sayer to make an invasion into the territory which they entered for the purpose of committing a series of robberies upon Japanese suburban merchants, and that the specific offenses or attempted robberies, including that of the Yamanaka store, were but a part of the general plan and conspiracy. He offered to show, and evidence was received which tended to establish his theory, that preparations had been under way by defendants and Muller for some days prior to November 1st, as shown by their automobile transaction, their meeting and conferring together, and the methods of travel and concealment of identity of person and the execution of the crimes which they had

planned to commit and, as contended, did commit, and other concerted acts tending to establish a conspiracy, all of which, he claimed, tended to show a general plan and scheme, and that the murder was but a likely incident of the lawless enterprise. [3] An opening statement is precisely what the term implies. It may or may not be made by the district attorney. There is no provision of law that compels him to make a statement. The right, however, has never been questioned. Its office is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect. The statement is not evidence, and no jury would accept it as facts proved. If the district attorney overstates his case or fails to sustain his opening statement by evidence, or, if, by the court's ruling, the evidence offered to support it is ruled inadmissible, the misfortune or error of judgment is likely to react to his disadvantage. [4] It is only in cases where the conduct of the district attorney is flagrantly improper or works a legal prejudice against the defendant that an appellate court would be justified in reversing a judgment. It was the theory of the appellants that the several robberies claimed to have been committed by the defendants were separate and distinct offenses, and tended in no way to connect the defendants with the perpetration of the attempted robbery by which the Japanese woman lost her life. It is elementary that separate and distinct crimes which have no reasonable connection with the commission of the crime with which a defendant is upon trial cannot be shown against him. But that is not the question before us. Here the district attorney offered to prove a conspiracy, an agreement to confederate together in the commission of a series of criminal acts to be executed on a definite tour of criminal enterprise, in a similar manner with the aid of rapid-transit agencies.

[5] The principle that evidence tending to connect a defendant with the commission of other crimes is admissible if there be a rational connection between the offenses or crimes sought to be proved and the main charge, if it fairly appears that in the commission of said crimes the participants acted in concert pursuant to a well-prepared scheme to engage in the commission of a series of crimes upon a definite, specific criminal enterprise, was accepted, without

question, as settled law in the early case of *People* v. *Brown,*
59 Cal. 345. Brown was jointly charged with four others
with the murder of William Wright. The facts, as es-
tablished by the evidence, are stated in the opinion as fol-
lows:

"The defendants lay in ambush, and they were there not
for any lawful purpose, but in pursuance of an agree-
ment which they had made to go into Mendocino county to
commit larceny, burglary and robbery, and, particularly, to
rob the tax collector of that county, and to resist by force
any who might attempt to interfere with them or to cap-
ture them. All of them had been ex-state prison con-
victs, and, in pursuance of their agreement, they met in
Mendocino county in the spring of 1879, armed with
Winchester rifles, guns and pistols, and supplied with am-
munition, and opened their unlawful enterprise by stealing
a steer, which they killed and converted into jerked beef
for their use. In that act they were discovered by a con-
stable of the county, who made a complaint against them
before a magistrate of the county. The magistrate issued
a warrant against them by fictitious names; and upon re-
ceiving it, the constable summoned a *posse comitatus* to
assist him in arresting the defendants."

Wright led the posse, and, coming to an extinguished
camp-fire, stooped down to feel the ashes. The outlaws
fired upon the posse and killed Wright and another. On
principle, there is no distinction between the Brown case
and the instant case. We do not hold that the commis-
sion of isolated, separate crimes haphazardly committed
by habitual criminals or by those who are merely criminally
inclined is sufficient to permit the introduction of evidence
of other crimes, but where the persons are engaged in a
plan, as pointed out by the authorities, the commission of
other crimes which logically tend to prove the existence
of a *continuing* conspiracy is admissible.

The identical question urged by appellants was decided
against their contention in *People* v. *Wilson et al.* (Cal.
App.), 245 Pac. 781, Mr. Justice Finlayson writing the
opinion. The defendants were charged by an indictment
containing two counts with two specifically described
burglaries. Evidence was admitted to show the commis-
sion of other robberies and. acts done by the defendants in

the furtherance of a common design to rob persons generally in and about the city of Los Angeles. The court correctly stated the law in the following language:

"In such cases it is no objection that the evidence covers a great many transactions and extends over a long period of time, or that it may show the commission of other crimes. When the question is whether the accused was a party to a general conspiracy, distinct overt acts in furtherance of such a design may be given in evidence. (*People* v. *Collins,* 64 Cal. 293 [30 Pac. 847]; *People* v. *Berry,* 191 Cal. 109, 122 [215 Pac. 74]; *Commonwealth* v. *Scott,* 123 Mass. 222 [25 Am. Rep. 81]; *Hall* v. *State,* 3 Lea (Tenn.), 552. See, also, *Commonwealth* v. *Stuart,* 207 Mass. 563 [93 N. E. 825], *State* v. *Roberts,* 95 Kan. 280 [147 Pac. 828], *Jenkins* v. *Commonwealth,* 167 Ky. 544 [3 A. L. R. 1522, 180 S. W. 961], and *Worden* v. *United States,* 204 Fed. 1 [122 C. C. A. 315].) In *Commonwealth* v. *Scott, supra,* it was held that on the trial of one charged with breaking into and entering a bank with intent to commit robbery therein, evidence by an accomplice of a general conspiracy previously formed between the defendant, himself and others to rob banks, in pursuance of which the robbery in question was planned and carried out, as well as evidence of the acts of the conspirators in making preparations to carry out the robbery, is admissible. In that case the court, on page 235, says: 'There being evidence sufficient to be laid before the jury to prove the conspiracy, as to which the presiding justice was in the first instance to determine, it was competent for the government to put in evidence any acts of the several conspirators in furtherance of the common purpose of the conspiracy, either before or after the robbery was completed.' In *Hall* v. *State, supra,* the supreme court of Tennessee held that under an indictment for the burning of a house evidence was admissible of the organization of a band of conspirators to rob and burn houses generally, if the particular act was done by them in furtherance of the general design, although this particular house was selected by them after the original agreement was entered into." (See, also, *Dorsey* v. *State,* 25 Ariz. 139 [213 Pac. 1011]; *People* v. *Molineux,* 168 N. Y. 264 [62 L. R. A. 193, 61 N. E. 286].)

Appellants direct our attention to a line of cases which, they contend, sustain them in the claim that the evidence by

which the district attorney offered to show the commission of other robberies was inadmissible and the appellants were, therefore, prejudiced thereby. The first case is *Boyd* v. *United States,* 142 U. S. 450 [35 L. Ed. 1077, 12 Sup. Ct. Rep. 292, see, also, Rose's U. S. Notes]. The crime of which appellants Boyd and Standley were convicted was the murder of Lunsby, committed April 6, 1890, while Boyd, Standley and one John Davis were attempting to commit robbery upon one of a group of persons. Davis, a confederate, was also shot and killed in the firing that ensued as a result of the alleged attempted robbery.

Evidence was allowed by the court which showed that on April 15, 1890, Standley robbed Richard C. Brinson and Samuel R. Mode; that on March 17, 1890, he and Boyd robbed Robert Hall; that on March 20, 1890, Standley and Davis robbed John Taylor; that on April 5, 1890, Davis, Boyd and Standley robbed Rigsby's store. The court gave strong intimations that had the evidence as to prior robberies been limited to the robberies committed upon Rigsby and Taylor—the first of which was committed one day before the robbery that resulted in the homicide and in which both of the defendants and Davis were shown to have participated, and the second, which was committed sixteen days prior to said homicide, in which only Standley and Davis were shown to have participated—the verdict of the jury would not have been disturbed, although the evidence offered to establish said two prior robberies went beyond the objects for which it was allowed by the court, to wit, identification of the defendants. The other alleged robberies were regarded by the court as being remote. It is further to be observed that the three persons who were participants in the alleged attempted robbery which resulted in murder were not shown to have been participants in any one of said prior robberies except the one committed the day before the murder in question. The reception of the evidence as to that robbery, it will be noted, was not held to be error. Further, the court points out that evidence was received in the case tending to show that the defendants were not engaged in an attempt to commit robbery at the time of the homicide, but were merely resisting an attempt on the part of the person killed and his associates, none of whom were officers, to arrest them for the commission of said alleged prior robberies or some of them.

If this claim of the defendants was true, then, of course, the commission of other alleged prior robberies could have had no connection whatsoever with the murder, as the homicide was not committed in the perpetration of or attempt to perpetrate robbery. Because the facts as stated in the opinion bear no resemblance to the facts of the instant case, the Boyd case cannot be regarded as an authority here. It is to be further observed that no claim of conspiracy was made as between Boyd, Standley and Davis in the commission of all of said prior robberies, and, obviously, upon the facts as stated, no such claim could successfully have been made. Boyd, Standley and Davis were not shown to have been co-conspirators in a general plan and purpose in the commission of but one of said prior robberies, to wit, the robbery committed the day before the homicide. All other alleged prior robberies were, therefore, separate and distinct crimes haphazardly committed by outlaws and neither the evidence, so far as the facts are disclosed by the opinion, nor the circumstances of the various crimes—possibly with the exception of the two pointed out in the opinion—justified their reception in evidence. No claim of conspiracy was made and no such evidence of a general plan and purpose as the district attorney outlined in his opening statement in the instant case was shown to exist in the case relied upon by appellants.

*People* v. *Jones,* 31 Cal. 566, is not an authority to the point for which it is cited. The major question in that case was whether the *corpus delicti* had been established. The court held that it had not been established, and that proof of other robberies committed by the defendant and his associates *subsequent* to the commission of the robbery for which he was on trial, being distinct and different offenses, could not be used in evidence of the commission of the crime of robbery charged against the defendant, as to the commission of which there had been a failure of proof. Such evidence, as the decision cited by appellants with much frequency observes, was "incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute." (*People* v. *Lane,* 100 Cal. 379 [34 Pac. 856].) The law ruling the Jones case, *supra,* was correctly stated. *People* v. *Lane, supra,* involves the question of the admissibility of evidence showing the shooting of a second person by a peace officer some few minutes *after* he had shot and killed another person

in an attempt to place said person under arrest. The officer was on trial charged with murder as defined by section 187 of the Penal Code. No claim was made that the killing was done in the perpetration of robbery or in an attempt to commit robbery, as defined by section 189 of the Penal Code. The court properly held that under the facts of the homicide the shooting of the second person in nowise tended to establish a pre-existing intention on the part of the officer to commit, with premeditation and deliberation, the murder charged against him. In that case it was necessary to establish all of the elements constituting murder, as defined by section 187 of the Penal Code. To constitute murder of the first degree there must be shown to exist in the mind of the slayer a deliberate, premeditated, preconceived design to take life. The subsequent shooting of the second person, under the facts of the Lane case, did not have the remotest tendency to establish malice on the part of the slayer.

This court, in discussing the question of intent, which is a vital question in all homicide cases where the killing is not committed while the slayer is engaged in the perpetration of any one of the felonies named in section 189, *supra,* properly observed that in murder an intention may be and is often simultaneously formed and its existence cannot be adopted as a predicate from which an inference can be logically drawn that it existed prior to its manifestation. "That it [intention] may have existed before is conceded; but that it did exist before, the subsequent fact does not either logically or clearly tend to prove." (*People* v. *Lane, supra.*) The question of intent, as that term is understood in its relation to murder, was the gravamen of the Lane case. It is there said that "collateral evidence may often be both relevant and competent to prove motive, which is *comparatively permanent and constant,* while it would be neither relevant nor competent to show intention as an isolated fact." (Italics supplied.) [6] In the instant case the law does not require proof of intent, deliberation or premeditation on the part of the slayers to constitute murder of the first degree. All that the law exacts is proof that the Japanese woman was killed by any one of the participants in the robbery if it be shown that the homicide was committed in the perpetration of or in an attempt to commit robbery.

The cases above reviewed are typical of other cases cited by appellants and it would serve no useful purpose to point out the elements of fact which distinguish them from the instant case.

[7] Conceding, for purposes of illustration only, the soundness of appellants' claim to the effect that evidence as to other crimes was not admissible, still appellants were not legally injured as the court ruled with them, excluding all evidence offered to show other crimes, and admonished the jury upon several occasions during the progress of the trial and at its conclusion not to consider any references made by the district attorney to any other crime or crimes than the one charged. Evidence of the meetings of Arnold, Muller and Sayer at Stockton, Florin and other places was clearly admissible, even though the general conspiracy theory be untenable, and it matters not that possible unfavorable impressions might have arisen from such associations. It was relevant to the specific crime described in the information. [8] The excluded evidence showing false or fictitious registrations by the defendants at certain hotels was also admissible. The several cases cited by appellants which held it to be error to admit evidence showing the defendant had at other times assumed a fictitious name are wide of the mark. In those cases the assumption of a false name had no possible connection with the fact of participation in the crime charged. In the instant case registration under false names by the defendants was a part of the plan adopted to avoid detection in the commission of the crime. [9] The rule is without exception that evidence which tends to show preparation looking to the commission of a crime, as well as acts and circumstances in pursuance of its accomplishment, such as concealment of identity, clandestine movements on the part of the accused and plans laid for escape from the scene of the crime, is admissible against one charged with crime. [10] So, too, the meeting together of persons prior to the commission of a crime with which they are charged, and the circumstances thereof, may be relevant to the questions of preparation and concert of action, and, therefore, may be properly brought to the attention of the jury. Such evidence would be admissible to identify the defendants with the commission of a single offense upon the theory that they were co-conspirators, or

under the provisions of section 31, Penal Code, which makes all persons who aid and abet in the commission of a crime principals in any crime so committed.

[11] Appellants also assign as prejudicial error the following statement made by the district attorney in his opening statement of what he expected to show, to wit, that on the morning of November 5th Muller, Arnold and Sayer went to the house of Mrs. Arnold, the divorced wife of Ray Arnold, in the city of Sacramento, and the latter met his former wife and discussed various matters with her; that Mrs. Arnold said she was going into the foothills to pick red berries; that Ray Arnold said, "Come with us, we are going to the foothills"; that Sayer disapproved of her going; that they discussed putting on a party later, and Mrs. Arnold inquired of Arnold, why, if he had money to put up for a party, he did not pay alimony which he owed for the support of their child. At this point one of the attorneys for the defendants, without making any formal objection to the proposal of the district attorney, addressed the court and stated that it seemed to him that the district attorney was again clearly attempting to prejudice the defendants' cause by stating matters which were absolutely immaterial and irrelevant. The court of its own motion withdrew from the jury's consideration all references made to unpaid alimony, holding the subject to be immaterial, and instructed the jury to disregard them. The fact that the defendant Arnold was in arrears in the payment of alimony could not have incited the jury to return its verdict against either or both of the defendants, especially after the court's statement to it that the subject was not material to the issues of the case. Mrs. Arnold was not a witness in the case and the alimony incident was not again referred to.

[12] Appellants complain that irreparable injury was done the defendants during the examination of witness W. J. Walsh, the proprietor of a hotel at Vallejo. Some time after midnight on November 5th two men whom the district attorney claimed were Arnold and Sayer entered Walsh's hotel and one registered for both. Walsh described them to the district attorney as being nervous men and further said that they impressed him as being "bad men." Walsh's testimony at the trial was a disappointment to the district attorney. Upon being requested by the prosecution to

describe the manner of the men who entered his hotel and to relate all that happened, the witness stated that they entered the hotel and registered and he assigned them to a room and that was all he could say about the matter. Upon further questioning he said, "they appeared to be a little nervous." Upon an attempt to show that the witness was suppressing the actual appearance of the persons whom he was called to identify as the defendants, the district attorney asked the following questions, which the court permitted: "Q. Did you not tell Sheriff Gum and myself in the presence of the Chief of Police of Vallejo . . . that these defendants were very nervous; that Sayer was extremely nervous, and how, as a hotel man who rented rooms for a number of years during your life, that was the first time you ever had the thought go through your mind that you were renting a room to a couple of bad men? A. I did." On cross-examination the witness completely destroyed the effect of his testimony as the following proceedings show: "Q. So far as you know you never saw these two men on trial before in your life? A. Not that I know of. Q. Before today? A. Well, I was here [Auburn] just about a week ago. I thought I saw them up in court. Q. You are not willing to positively identify these two defendants as the two men who were at your hotel, are you? A. I would not want to swear to it, no. Q. And you realize what it might mean and you want to be fair to the defendants? A. I do, yes, sir. Q. As near as you are willing, you say at this time there were two men that came there—that true—and registered? A. Yes, sir. Q. And whether or not these are the same ones, you are not going to swear to it? A. No, I am not positive. Q. That is all." This concluded the examination of the witness. It is very apparent from the examination above set out that the witness failed to identify the defendants as the men whom the witness thought were "bad men." The error committed by permitting the district attorney to impeach or refresh the mind of the witness, grant it to be error, was not sufficiently prejudicial to justify a reversal of this case had the witness testified in somewhat positive language, and much less so when its force is wholly destroyed by the witness, who stated under oath that the appearances of the two persons which created in his mind the thought which he previously gave expression to did not convince him that the persons that con-

fronted him in court were the same men that registered at his hotel. The most the witness gave was his impression, which did not amount to a statement of fact.

[13] The father of Arthur Muller was called as a witness by the prosecution for the purpose of eliciting certain alleged statements made by the son to him shortly after the homicide and to identify the signature of the son to the Muller-Casalini automobile sales contract and also to identify a shirt which had been delivered to him by the coroner of San Francisco. The sales contract was clearly admissible as a circumstance connecting Muller with the ownership of the abandoned car found on the highway a short time after the homicide was committed, and the entire subject matter taken in connection with all the other facts of the case was properly submitted to the jury's consideration. The shirt and other wearing apparel presumably worn by Muller at the time of his death was inconsequential in effect.

[14] The appearance and manner of Muller three hours after the commission of the homicide was admissible in evidence relative to consciousness of guilt, its weight, effect and sufficiency being solely a matter for the jury's consideration. It was incumbent upon the prosecution to show that Muller was one of the perpetrators of the crime in order to make out a case against the defendants. That Muller appeared nervous was but a circumstance that might or might not have special significance. [15] The fact that Muller was not on trial or was not even alive at the time of trial did not foreclose the prosecution from showing his participation in the crime. Evidence showing the means of his escape, the route taken by him on his flight, and every incriminatory act done by him, and any evidence of the crime that may have been found upon his person was admissible even though Muller was dead at the time of the trial. [16] The district attorney attempted to get before the jury, limited solely to Muller, a purported conversation which the latter had with his father at the time he appeared at the father's home. In his opening statement to the jury the district attorney stated, against the protests of the defense, that he expected to show that Muller appeared at his father's home and told him and Muller's sister-in-law ''what had happened; told them of the other events that I have

narrated—.'' Here the defendants interrupted and assigned the statement as misconduct on the part of the district attorney. The sentence was not finished, but sufficient appears to warrant the inference that the son had related to the father substantially the facts which the district attorney expected to prove as related by him in his opening statement. The court remarked to counsel for the defendants that the district attorney had not stated what Muller had said to his father. After much discussion between court and counsel, the district attorney, continuing, said: ''Muller asked his sister-in-law if she would testify in case he was brought in, that he had been home all the afternoon. She protested and after some discussion she said she would so testify.'' Counsel for the defense also assigned this statement as misconduct. The court ruled that any alleged conversations between Muller and third persons not in the presence of the defendants were not admissible. The district attorney suggested that he would again present the question during the trial. The father of Muller was called in keeping with the suggestion of the district attorney and asked to relate the conversation he had with his son at the time of the latter's visit at his home. The defendants' attorney objected to the evidence and the court excluded it. We cannot say that the district attorney was guilty of wilful misconduct in his effort to get before the jury the statement made by Muller to his father as to his part in the crime. Had Muller been alive the statements made to the father would have been admissible, at least as against him. But, however that may be, the court excluded the evidence and upon numerous occasions admonished the jury to disregard the statements of the district attorney as to any conversations which he claimed took place between Muller and his father.

[17] It is proper here to observe that the shooting of the Japanese woman by Muller, if not actually admitted by counsel for the defendants, was not seriously questioned at the trial, their efforts being, so far as Muller was concerned, to break the force of any evidence that might tend to connect them in crime with him. Of course, any legal evidence tending to connect the defendants with Muller was material and relevant. If this was not so, section 31 of the Penal Code, would be rendered meaningless and ineffectual, and the statutes penalizing conspiracies would fall with it.

It was not error to admit in evidence the photograph of Muller, by which certain witnesses identified him, and which was, no doubt, scrutinized by the jurors. No evidence was offered to show that it was not a true likeness. His father was on the stand and an opportunity was given to minimize its value as identifying evidence if it was vulnerable to impeachment. The registrations testified to by the hotel proprietors, had the handwriting been identified as that of either of the defendants, would also have been admissible. [18] The testimony of the deputy sheriff who acted as jailer of the Placer county jail and one or two other attendants, who heard sounds emanating from the cells occupied by the defendants and another prisoner, pending trial, and the finding of fresh cuts upon the cell bars immediately thereafter, and the location of about a dozen saws concealed in a box to which the defendants had access was properly admitted. The admissibility of such evidence as a circumstance tending to show a consciousness of guilt was approved in the case of *People* v. *Crowley,* 13 Cal. App. 322 [109 Pac. 493] ; wherein the facts showing an attempted escape from jail were not unlike the facts testified to by the jail attendants in the instant case. (See, also, *People* v. *Ellis,* 188 Cal. 682 [206 Pac. 753], and *People* v. *Welsh,* 63 Cal. 167.)

[19] The final charge to the jury was unusually lengthy and certainly cannot be said to have been unfavorable to the defendants. The instructions, however, are vigorously attacked and some few of them, disassociated from the context of the entire charge, may appear vulnerable to the critical analysis to which they have been subjected by appellants, but when considered as a whole it cannot be said that the infirmities contained therein deprived the defendants of a fair and impartial consideration of the case by the jury. Time after time the jury was instructed that unless every essential element constituting the crime was proved beyond a reasonable doubt and to a moral certainty the verdict must be one of not guilty. The burden of proving the defendants guilty beyond a reasonable doubt and the presumptions of innocence which accompanied them throughout the trial were phrased in many different forms and the jury was repeatedly told in positive language that unless the defendants were shown to be guilty of the specific offense

alleged against them the jury must find them not guilty. [20] We agree with counsel that instructions on the subject of reasonable doubt should be expressed in the language that has been frequently approved by this court. No enlargement upon the approved instructions should be attempted. Trial courts should not assume the unnecessary risk of improving upon the age-tested instruction as prepared by Chief Justice Shaw. We have examined the instruction given in this case and find nothing therein that can be said to be a material departure from the standard instruction on the subject. Every principle of law announced by the instructions given has been approved by cases of this and other courts. [21] By instruction No. 7 the jury was told that proof of guilt beyond a reasonable doubt "means that the evidence must be such that it will satisfy the mind, conscience and judgment of the juror, and satisfy him of the guilt of the party to a moral certainty and beyond this reasonable doubt."

Instruction No. 8 was as follows: "The prosecution is not called upon, nor is not bound to prove the guilt of any person accused of crime to a demonstration, to an absolute certainty, for moral certainty of guilt is all that the law demands, such certainty as satisfies and directs the minds of those who are bound to conscientiously act upon it."

Besides the foregoing instructions on the subject of reasonable doubt an instruction framed by the defense and doubtless entirely satisfactory to it was given. The jury could not have suffered from a want of enlightenment on the subject. By four elaborate instructions the jury was warned against harboring any prejudice against the defendants by reason of statements made by the district attorney as to the commission of other crimes by the defendants or otherwise arising during the trial. The two which follow are typical of the others:

"You are instructed in this case that you must disregard and banish from your minds any statements or offer of proof by the district attorney, evidence in support of which was not admitted by the court; and you are distinctly instructed that statements of the district attorney in his opening statement as to proof of other crimes must be entirely disregarded by you, and you must not in any wise consider them

in determining the question of guilt or innocence of these defendants.''

"Under your oaths as jurors you are to consider only such evidence as has been admitted by the court, and you must disregard and discard from your minds every impression or idea entertained by you before being sworn as jurors in this case; you must also disregard and discard from your minds every impression or idea suggested by questions asked by counsel which were objected to and the objections to which were sustained. This case is to be tried only on the evidence which is before you, and not on suspicions that may have been excited by questions of counsel, answers to which were not permitted. You must not consider any evidence that has been excluded by the court in determining any fact in this case.''

[22] The court in attempting to instruct the jury in the language of section 31 of the Penal Code, defining principals in crime used *or* instead of *and*, the instruction reading: "All persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or aid *or* abet its commission, shall be prosecuted and punished as principals.'' This instruction was given in the abstract and immediately following it a specific, concrete instruction was given on the subject and the conjunction *and* placed in its proper order. If the instruction as given in the abstract was erroneous it was cured by the elaborate instruction that followed. (*People* v. *Dole,* 122 Cal. 486 [68 Am. St. Rep. 50, 55 Pac. 581].) The jury in the instant case, as was said in the case above cited, could not, in view of what followed and the general circumstances of this case, "have taken the charge as to aiding and assisting in its narrow and literal sense'' as used in the first instruction.

[23] Exception is taken to an instruction framed on section 1963, subdivision 5 of the Code of Civil Procedure, defining disputable presumptions, given upon request of the prosecution. The subdivision provides that evidence wilfully suppressed is presumed to be adverse, if produced. The instruction was to the effect that if the jury should find that the defendants had *wilfully* suppressed evidence, in the absence of proof negativing the presumption, it should consider that such evidence, if produced, would have been adverse to the defendants. The issue to which this instruction

could have been applicable is not apparent. It should not have been given. Appellants claim that it could only have been regarded by the jury as equivalent to stating that the failure of the defendants to take the stand and testify was a suppression of evidence and raised the presumption that had they done so their testimony would have been adverse to their case. We do not think the language of the instruction is susceptible of such a construction. Their failure to become witnesses could not have been considered as a *wilful suppression* of evidence. They had a legal right to remain mute and the court by numerous instructions repeatedly, at the request of the appellants' counsel, told the jury that no adverse or unfavorable inference could be indulged against them because they had not taken the witness-chair. *Three* separate instructions supporting the right of the defendants to remain silent and instructing the jury that no adverse presumption should be indulged against defendants for not testifying in the case were given. Giving effect to the natural meaning of words, the instruction cannot be denounced as prejudicial error, especially in the light of the other instructions.

[24] Complaint is made to the giving of the instruction that has been frequently before this court during the past two years, wherein the jury was instructed that in determining whether the death penalty should be pronounced or whether the defendants should be relieved of the extreme penalty of the law was within the discretion of the jury, but the discretion was not an arbitrary one, etc. This court, while it has refused to reverse cases solely because of the giving of the instruction, has, nevertheless, advised against any suggestion coming from the court which might be regarded as a limitation upon the jury's right to exercise unhampered its discretion in determining whether the defendants should suffer death or be imprisoned in the state prison for life. The precise instruction was held not to be error by the decisions of this court in our earlier cases and has been given special attention in a number of recent decisions which, it would seem, should be known to all prosecuting attorneys, trial courts and members of the profession. We again repeat, the instruction does not, of itself, compel a reversal of a criminal case. (*People* v. *Craig,* 196 Cal. 19 [235 Pac. 721] ; *People* v. *Casada,* 194 Cal. 679 [230 Pac. 9] ;

*People* v. *Wolfgang,* 192 Cal. 754 [221 Pac. 907]; *People* v. *Connelly,* 195 Cal. 584 [234 Pac. 374]; *People* v. *Perry,* 195 Cal. 623 [234 Pac. 890].)

[25] The alibi instruction given in *People* v. *Lee Gam,* 69 Cal. 552 [11 Pac. 183], was given verbatim in the instant case. This court, confining itself to the *only* instruction given on the subject of an alibi in the Lee Gam case, but which is not true of the instant case, said: "Taking the charge as a whole, and giving it an unstrained interpretation, it does not appear that the jury were instructed upon the weight of evidence.

"The part objected to was very similar to that given by the learned judge below in the case of *People* v. *Wong Ah Foo,* 69 Cal. 180 [10 Pac. 375], and as was said there, so it should be declared here, that, 'viewed in the light of good sense, we do not see that the language complained of went beyond a reasonable and fair latitude of observation permissible from the judge to a jury.' (Bishop's Crim. Proc., 982–1064.)"

The portions of the instruction which are vigorously assailed by counsel for the defendants read: "The effect of an alibi, when established, is like that of any other conclusive fact presented in a case. Showing, as it does, that the party asserting it could not have been present at the time of the homicide, and therefore did not participate in it, is, when credited, a defense of the most conclusive and satisfactory character.

"The fact, however, which experience has shown, that an alibi as a defense is capable of being and has been occasionally successfully fabricated; that even when wholly false its detection may be matter of very great difficulty; and that the temptation to resort to this as a spurious defense may be very great, especially in cases of importance; these are considerations attendant upon this defense which call for some special suggestions upon the part of the court.

"These are, that while you are not to hesitate at giving this as a defense full weight, that conclusive effect to which, when established, it is justly entitled, either as entirely satisfying you of the innocence of the defendant or as creating the reasonable doubt which entitled the defendants to an acquittal, still you are to scrutinize the testimony offered in the support of an alibi with care, that you may be satisfied

that a fabricated defense is not being imposed upon you."

There is no merit in the complaint of appellants that the first paragraph of the instruction tended to cast upon the defendants the burden of proving or establishing beyond a reasonable doubt the alibi defense. It simply informed the jury that when the alibi is established it constitutes a defense of the most conclusive and satisfactory character, and by the last paragraph of said instruction the jury was told, in effect, that it mattered not whether the alibi was conclusively established or whether the evidence was such as to merely create a reasonable doubt in the minds of the jury, the defendants would be entitled to an acquittal in either case. The instructions given in the cases of *People* v. *Roberts,* 122 Cal. 377 [55 Pac. 137], *People* v. *Levine,* 85 Cal. 39 [22 Pac. 969, 24 Pac. 631], and *People* v. *Lattimore,* 86 Cal. 403 [24 Pac. 1091], which are cited as passing upon an instruction substantially identical with the instruction given in the Gam case, *supra,* and the instant case, differ materially from the latter. The instruction in the Roberts case told the jury that an alibi is a good defense "when satisfactorily proven" and "whether or not an alibi was proven and established to your satisfaction in this case is a fact for you to decide," etc. No suggestion was made in the case that if the alibi was sufficient to raise a reasonable doubt the defendant was entitled to an acquittal.

The instructions given in the Levine and Lattimore cases, *supra,* which were identical, went far beyond the language used in the instant case in unfavorable comment as to the defense of alibi, and were lacking in curative language, and yet both judgments were affirmed. In the Lattimore case the court, addressing itself to the alibi instruction, said: "We again repeat that the defense of *alibi* is 'not one requiring that the evidence given in support of it should be scrutinized otherwise or differently from that given in support of any other issue in the cause'; and we may add that if trial courts will cease to give this particular form of instruction, the ends of justice will be equally as well subserved, and the administration of the laws less embarrassed. But in this case, as in the Levine case, the charge of the court, taken as a whole, was so full and fair to the defendant that we cannot conceive that any injury resulted to the defendant from this unnecessary instruction in regard

to the scrutinizing of the evidence given in support of the defense of *alibi.*"

In *People* v. *Girotti,* 67 Cal. App. 399 [227 Pac. 936], the court had before it an instruction similar to the one given in the instant case. Before the question of alibi had been reached the court had concluded that the case must be reversed because prejudicial error was committed by the court in its ruling on a matter of evidence. The court criticised the instruction here given, and, without stating definitely whether the assumed error was reversible error, concluded by saying "the instruction should never be given." It will be observed, however, that Mr. Justice Finch, who was the author of the opinion in the case last cited, had no occasion to consider the effect of many curative instructions such as were given in the instant case. *People* v. *Smith,* 189 Cal. 31 [207 Pac. 518], contains the last expression of this court on the subject of alibi as a defense. That decision is not strictly accurate in the statement that the Levine and Lattimore instructions were the same as the Lee Gam instructions, and it is in error in the statement that in instruction similar to the Lee Gam instruction was held to be reversible error in the Roberts case "upon the grounds that they constitute a charge upon the weight of the evidence, and that they cast the burden of proof upon the defendant." The Roberts instruction, as we have already pointed out, was unquestionably amenable to the vice imputed to it, but this cannot be said of the Lee Gam instruction as to the point of casting the burden of proof upon the defendant to prove the alibi. The decision, however, approves the judgment for the reason "that the state of the evidence in the case at bar renders the error harmless."

It would seem that if there is such a thing as surcharging a jury's mind with the importance of giving full faith and credit to a defense based upon an alibi that it was accomplished in the instant case. Nine separate instructions of considerable length and covering every possible phase of the law as contended for by the defendants were given. A fair sample of the instructions given follows:

"The court instructs the jury that an alibi simply means that the defendants were at another place at the time the crime charged is alleged to have been committed, and therefore could not have committed it. All the evidence should

be carefully considered by you, and, if the evidence on this subject, considered with all the other evidence, is sufficient to raise a reasonable doubt as to the guilt of the defendants, you should acquit them. The defendants are not required to prove an alibi beyond a reasonable doubt, or even by a preponderance of evidence. It is sufficient to justify an acquittal if the evidence upon that point raises a reasonable doubt of their presence at the time and place of the commission of the crime charged, if you find that a crime was committed.''

The defense when examining jurors on their *voir dire* made special emphasis of alibi as a defense and examined practically every juror as to whether he would carefully, conscientiously and honestly consider such a defense. No juror was accepted who did not answer satisfactorily the many questions propounded as to whether he would give the same careful, unprejudiced consideration to the defense of alibi as he would to any other defense known to the law. We are of the opinion that the defendants were not prejudiced by the court's charge taken in its entirety.

The deprecated portions of the instructions which are pointed out in the above-cited cases cannot, under legal precedents of this court, be held to constitute reversible error in the instant case for the reasons herein stated. Nevertheless, we again call to the attention of district attorneys who continue to offer, and to trial courts which continue to give them, that in so doing they assume an unnecessary risk.

Appellants further complain that the court in giving its charge to the jury assumed in its illustrations of propositions of law that certain facts had actually been proved in the case, which was to the prejudice of the defendants. The record does not sustain appellants' complaint.

The court of its own motion gave as the last instruction one defining murder in its different degrees and the penalties attaching thereto. Bitter complaint is made because the court failed to tell the jury in this single instruction what it must do ''in case they found the defendants innocent.'' The court was here merely instructing the jury as to the several kinds of verdicts it might return in the event that it should find the defendants guilty. There was no occasion to inform them concerning the return of a simple verdict of not guilty,

but the court in this connection did read to and submit to the jury a verdict of not guilty. The court repeatedly throughout the charge instructed the jury in various forms and combinations of words that it must return a verdict of "not guilty" and acquit the defendants unless they were proved guilty in the manner prescribed by law. The contention is wholly without merit.

Other assignments of error have been made and those which are not disposed of in the discussion of the major questions are deemed not to be of sufficient importance to require an extended discussion.

A careful examination of the entire record convinces us that the defendants were fairly tried and legally convicted and that no errors of law of sufficient gravity to warrant a disturbance of the verdict of the jury were committed. The court was fair and impartial in its rulings and maintained that judicial calm which should always characterize trial judges in presiding over cases where human life is involved. The district attorney was zealous, but it cannot be said from the record that he was guilty of wilful misconduct or contumacious demeanor. His zeal, however, was not greater than that shown by counsel for the defendants in their earnest effort to protect the rights of the defendants.

The orders and judgments appealed from are, therefore, affirmed as to each defendant.

Waste, C. J., Richards, J., Shenk, J., and Curtis, J., concurred.

Rehearing denied.