[Crim. No. 3121. In Bank.—November 5, 1928.]

THE PEOPLE, Respondent, v. EDGAR LAPIERRE, Appellant.

T. J. O'Leary for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

PRESTON, J.—This appeal is by Edgar Lapierre from judgment of conviction and order denying his motion for a new trial. Appellant and one Leo Archambault are brothers-in-law, Gabrielle Lapierre, the wife of appellant, being the sister of Archambault. These three persons were jointly charged on the thirteenth day of January, 1928, in the superior court of Alameda County by the district attorney with the crime of murder, alleged to have been committed on January 3, 1928, in the unlawful taking of the life of William J. Davis, a police officer of the city of Oakland. All three defendants were tried together and expeditiously, and on February 15, 1928, convicted, the two men of murder in the first degree and the woman of manslaughter. Appellant was sentenced to death, Archambault to life imprisonment and the wife of appellant to San Quentin for the term prescribed by law for manslaughter. Archambault did not appeal but the other two defendants did and we are to consider first the appeal of this defendant, Edgar Lapierre.

The facts are that on January 3, 1928, two police officers, in civilian clothes, deceased, and one Jules Sternitsky, having knowledge of the commission of felonies by these parties and of the existence of a warrant for the arrest of appellant and his wife issued from the county of Los Angeles, went to the residence at 1712 68th Avenue, Oakland, about 3:15 P. M., of said day to arrest the defendants above named. Sternitsky was admitted to the house through the front door by the wife, Gabrielle Lapierre, who gave as her name Mrs. Warner, and denied her identity as Mrs. Lapierre. The officer told her that he had information that her name was Lapierre and that her husband and brother were home. To this she replied: "No, they are working, they won't be home until 5 P. M." Sternitsky displayed his badge of office, told her he was an officer and that he was going to make a search of the house for the men. The movements of the woman were peculiar and the officer watched her glances toward the door leading to the kitchen, which was slightly ajar. He saw the face of a man peering out from the kitchen through this door. Officer Davis meanwhile had gone to the back of the house. At this juncture Sternitsky called out to him, "They are in the kitchen, Bill . . . break in. Be careful." Following this a pistol duel ensued between the defendant and Davis, in which Davis was mortally wounded by bullets from the revolver of defendant, who used two guns in the battle. Following the shooting of Davis, the alarm was turned in and uniformed police officers arrived. After an exchange of shots between appellant and some of these officers, appellant, upon the advice of his wife, surrendered, coming out with the two guns in his hand held by the barrels thereof. After the shooting of Davis and before and while the officers were arriving, Mrs. Lapierre moved around the house from one window to another, looking out, evidently acting as a lookout and informing the two men as to the number of officers who were surrounding the house. After the surrender, appellant made the statement, given as a reason for the shooting: "Because I was caught, and I wanted to shoot my way out, and my wife spoke up to me in the house and asked me to quit shooting and give myself up."

As showing that these defendants had given themselves over wholly to a career of crime of all types, the following

*résumé* of part of the evidence, as briefed by respondent, is here given:

On July 1, 1927, the office of the Mother's Cookie Company of Oakland was burglarized and seventy-five pay-roll checks were stolen; those checks were made out in the names of various payees, the amounts were filled in but the checks were not signed. On July 3d or 9th (a Saturday) Edgar Lapierre and his wife passed one of those checks in the store of Edward Frustman in Los Angeles, the check being indorsed "M. J. Boyle" by Edgar Lapierre in the presence of Frustman. A pair of shoes was purchased and $46 was given in change.

On July 7th Gabrielle Lapierre passed another one of the checks in the Morris Shirt Shop in Los Angeles, getting a shirt and a tie and $14.35 in change. Gabrielle Lapierre signed the name "Mrs. Nichols" in the presence of M. T. Greenberg.

On July 8th Mr. and Mrs. Lapierre rented a house in Los Angeles, paying one month's rent in advance and giving their name as Mr. and Mrs. Roberts. They stayed in the house but ten days, left it unlocked and did not return. At that time Gabrielle Lapierre's hair was dark, although it was evidently either blond or red at the time of the trial.

During the month of July Gabrielle Lapierre, accompanied by her three year old child, made a purchase in the Gates Drug Store in Los Angeles, and passed one of the Mother's Cookie Company pay-roll checks, indorsing it "Dorothy France."

On November 22d Edgar Lapierre and Archambault rented a Chrysler roadster in Los Angeles, Lapierre giving his name as Elmer E. Warner, and his address as 216 North Hoover Street. He put up a $35 deposit and stated that he would return at about 4 o'clock P. M. The car was returned to the owner on February 4, 1928, by the police, it having different license plates on it, having been recovered by the Oakland police on January 3, 1928. Edgar Lapierre testified that he had intended to keep it.

On November 23d George Lee was held up and robbed at the point of a pistol by Edgar Lapierre and Archambault in Oakland, and on the same day John Holly was also held up and robbed at the point of a pistol by these men.

On November 25th the drug-store of Leonard G. Ellis was burglarized by Edgar Lapierre and Archambault. Goods of the value of $150 were taken, and about $85 worth of the goods were returned by the police after the arrest of Lapierre and Archambault.

On November 25th Muller's Grocery Store was burglarized and groceries were taken which were later found in the house of appellants. On November 25th the place of Glaser, a florist, was burglarized by Edgar Lapierre and Archambault.

On December 1st Mueller's Brothers Market was burglarized by them.

On December 2d Rouska's Grocery Store was burglarized by them.

On December 2d Thomas' Drug Store was burglarized by them.

On December 2d Lange's Meat Market was burglarized and a .45 frontier model Colt's revolver, which was used by Edgar Lapierre in his "duel" with Davis, was stolen.

On December 3d they burglarized the Barsi Barber Shop and a gold watch was taken, which was later found in the possession of appellants and returned to the owner.

On December 4th Green's Hardware Store was burglarized by them.

On December 5th the Sanders Grocery Store was burglarized by them.

On December 6th Skaggs' store was burglarized by them, and an overcoat taken was found in the possession of appellants and returned by the police.

On December 8th the Bay State Market was burglarized by them, but nothing was taken.

On December 14th the place of business of the Black & Decker Electric Tool Company was burglarized and three electric drills stolen, two of which were later found in the house in which the murder of Davis occurred, and the third was found in a black bag which was dropped by Edgar Lapierre on December 17th, as hereinafter set forth.

On December 15th the Bay City Lumber Company's office was burglarized, the combination of the safe being drilled out by a circle of small holes.

On December 17th Police Officer Blackstone, in police uniform, saw Edgar Lapierre and Leo Archambault, be-

came suspicious of them, and, approaching them, asked them where they were going. As he did so, the two men separated so as to form a triangle about eight feet on each side. In this position it was impossible for the officer to watch both of them at once, whereupon Lapierre said: "Throw up your hands, we will show you where we're going," and as the officer looked Lapierre drew a pistol. Lapierre then kept the officer covered with the pistol, while Archambault left to return a few minutes later with an automobile. The officer was then commanded to turn his face to the wall. The two men then got into the automobile and drove away. The officer started shooting at them, and they returned his fire. They drove away in a Chrysler roadster. During the course of this occurrence Lapierre said to the officer, "If you bat an eye I will shoot you."

Upon that occasion Lapierre carried a black bag which was identified by the officer and received in evidence. A few minutes later it was found by Officer Reedy and contained an electric drill, an extension wire, a two-celled spotlight with a piece of playing card over the glass with a small pine-hole through the playing card, and a set of drills. The electric drill was of Black & Decker manufacture and was identified by Frank Malley of the Black & Decker Electric Tool Company. After his arrest Lapierre admitted to Officer Blackstone that he had disposed of the bag upon that occasion, and that he was on his way to crack the safe in the Grandma's Cookie Company plant and also the Rawley plant.

On December 19th Gabrielle Lapierre opened a bank account under the name of Hollenbach. She signed the name Hollenbach by printing it, and explained that her reason for so doing was that she was French and had difficulty writing in English.

On December 21st Lapierre and Archambault burglarized the Chandler Grocery Store.

On December 23d they burglarized the Smithson Meat Market.

On December 21st Gabrielle Lapierre established credit at Capwell's Department Store in Oakland by entering into a contract of sale for a fur coat, and giving a check signed "Hollenbach" by her, the signature being printed; the check was found to be good. On December 24th she passed

five checks signed in the name of Hollenbach, but in the meantime she had withdrawn her balance.

On December 25th Lapierre and Archambault burglarized the store at 7637 Foothill Boulevard in Oakland. On December 28th they burglarized the Hagey Meat Market. On December 29th they burglarized the Roberts Coal Yard.

Only a few of these various burglaries were established by independent evidence; most of them were established by the admissions of Lapierre and Archambault made to the police after their arrest, in which they admitted having committed twenty-two burglaries between November 22d and January 3d. They were also admitted by Edgar Lapierre while on the witness-stand. The robberies mentioned in the foregoing *résumé*, however, were all established by independent evidence, as were the bad and forged check offenses and the embezzlement of the automobile.

The evidence is too clear for controversy that these defendants were acting in concert in the commission of forgeries, burglaries, robberies, and kindred crimes; that they had committed crimes of this character almost without number and were prepared to resist all attempts to arrest them, even to the extent of taking human life if necessary to prevent the frustration of their bold and desperate plans. That some brave officer of the law should be shot down in cold blood as an incident in the career of such criminals as these defendants were shown to be is not surprising.

The brief of appellant is extremely scant in material, and it is doubtful whether any real assignments of error appear in the record. The most that can be ascertained is that complaint is made of the court's action in admitting over objection the recounting of a number of said alleged independent crimes. The only real objection made to the introduction of this testimony was during a preliminary discussion between counsel and the court, wherein the court announced his tentative intention to hold the testimony admissible. When the testimony was actually offered, witness after witness was allowed to take the stand and was examined and cross-examined on this subject without objection on the part of appellant. Treating the assignment as properly made, however, the question presents no difficulty. In the first place, such testimony, and the whole thereof, was admissible for the purpose of showing the motive actuat-

ing defendant in the shooting of the police officer. His career of crime, the presence of the officers, his consciousness of guilt and the fact that he knew that he would probably be arrested were strong and convincing reasons for his unprovoked murder of the officer. These crimes, therefore, furnished clear proof of the motive actuating the defendant to kill. Abundant authority may be found upon the question in this state, among which are the following cases: *People* v. *Valliere*, 123 Cal. 576, 577 [56 Pac. 433]; *People* v. *Prantikos*, 164 Cal. 113, 116 [127 Pac. 1029]; *People* v. *Bringhurst*, 192 Cal. 748, 752 [221 Pac. 897]; *People* v. *Woods*, 147 Cal. 265, 271, 272 [109 Am. St. Rep. 151, 81 Pac. 652]; *People* v. *Middleton*, 65 Cal. App. 175, 179 [223 Pac. 448]; *People* v. *Cook*, 148 Cal. 334, 340 [83 Pac. 43].

There was also ample evidence to warrant the admission of this evidence, and the whole thereof, upon the theory that a general conspiracy to rob victims and burglarize buildings and places of business and to commit forgeries existed and was in flourishing operation at the time of this homicide, and this conspiracy contemplated resistance in case of attempts on the part of police officers to apprehend and arrest all or any of them, such resistance to be to the extent of taking human life, if necessary. Under this state of the record, the court was justified in the application of an exception to the general rule that evidence of separate and independent crimes will not be heard on the trial of a defendant for a separate and distinct felony. (*People* v. *Yeager*, 194 Cal. 452, 483 [229 Pac. 40]; *People* v. *Brown*, 59 Cal. 345; *People* v. *Kauffman*, 152 Cal. 331 [92 Pac. 861]; *People* v. *Arnold*, 199 Cal. 471, 487 [250 Pac. 168].)

The rule and its exception are stated in *People* v. *Morani*, 196 Cal. 154 [236 Pac. 135], as follows: "It is well settled that a defendant in a criminal cause can be tried for no other offense than that charged in the indictment or information, and therefore it is not competent for the prosecution to prove the commission of independent crimes by the defendant, the evidence of which has no tendency to prove some material fact in connection with the particular crime charged. But this rule does not exclude such evidence when it logically tends to prove any fact necessary or pertinent to the

proof of the crime for which the defendant is being tried. Such evidence is not to be rejected because it also tends to prove the commission of other crimes or because it may prejudice the defendant in the minds of the jurors. Generally speaking, such evidence is admissible when it tends to establish intent, guilty knowledge, motive, a common scheme, plan or system, or when it tends to connect the defendant with the crime charged, or when the other crimes are part of the *res gestae* (8 Cal. Jur., p. 60 et seq.)." (See, also, *People* v. *Wilson*, 76 Cal. App. 688, 699 [245 Pac. 781].)

No other assignments of error require attention. We have examined the whole record in this case and find no reason whatever for disturbing the action of the court and jury. The judgment and order appealed from are affirmed.

Curtis, J., Richards, J., Shenk, J., Waste, C. J., and Seawell, J., concurred.