[Crim. No. 578. Fifth Dist. Apr. 16, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
GRADY EDWIN CLARK, Defendant and Appellant.

## Counsel

Thomas A. Harris and J. Montgomery Carter, under appointments by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and James T. McNally, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GARGANO, J.**—Defendant appeals from a judgment entered on a jury's verdict finding him guilty of murder in the second degree. He contends that during the trial errors of law occurred which resulted in a miscarriage of justice. The alleged errors are: that the trial judge erroneously denied defendant's motion to strike the testimony of Dr. Bryant Rees, an entomologist; that the court improperly admitted evidence that defendant had committed several acts of rape, attempted rape and fellatio; that the prior extrajudicial inconsistent statements of the witness Marjorie Wiser were admitted for all purposes in violation of defendant's Sixth Amendment right of confrontation; that the admission of testimony concerning the conduct of defendant's wife was prejudicial; that the court erred when it refused to admit into evidence a paper napkin found in the victim's purse.

The murder victim, Verda Ribble, arrived in Fresno on March 18, 1967, between the hours of 2 and 3 p.m. She immediately went to see her sister, Shirley Richardson, who was residing in the Plaza Hotel. From there the two women went to the C & B Cafe where Mrs. Richardson was employed. Verda ate a chicken dinner. Afterward, she told her sister that she was "going to the Brazil Club and have some beer" and would return later to pick up the key to the hotel room, as she was going to stay there that night. This was the last time that Mrs. Richardson saw her sister alive.

On the same evening, shortly after 9 p.m., defendant walked up to the

front door of a house on Grantland Avenue near Shaw and told the occupants (Robert, Raul, Antonette and Antonia Silva, and Rosemary Cisneros) that his car was stuck nearby and asked them to call a tow truck for him. He was wearing a coat with a fur-lined collar, and had blood on his face, appeared to be nervous, and refused an invitation to come in and wash up. When two phone calls met with no success, defendant asked Robert Silva to pull his car out with Silva's pickup truck. Silva agreed, but was unable to extricate defendant's mired automobile; it was in a ditch alongside a small dirt service road that abuts Grantland Avenue and was headed toward a fig orchard. At defendant's request, Silva drove him to a Beacon service station on old Highway 99 and left him there. The service station attendant recalled that defendant was wearing a coat with a fur-lined collar. He said that defendant had two scratches, one on his neck and one on his nose. There were a dozen little spots of blood on defendant's coat.

A few days later, on March 22, 1967, the body of Verda Ribble was discovered in a fig orchard in the vicinity of Grantland Avenue and Shaw Avenue in Fresno County. The orchard abutted the access road in which appellant's car had been stuck. The body was clad in a checked dress with no undergarments beneath; a white collar was knotted around the victim's throat. A shoe with a spiked heel, a collar with snaps that fit the victim's dress, a nylon stocking that was torn practically in half, a black patent leather purse, a head scarf and a small change purse were found strewn around the dead body. A panty girdle, right side out, with a nylon stocking attached, was discovered nearby. The victim's panties were hanging on a tree limb. The grass beneath the tree was trampled, and there was blood on the white collar, on the panty girdle and on the dress. Two different sets of footprints were discovered at the scene of the crime. One set was positively identified as having been made by the victim. The other showed definite similarity to a shoe later recovered from defendant, but no positive identification of this print could be made. Tire tracks were also discovered on a road and into the orchard for a distance of 112 feet. A tread analysis could not be made of these tracks.

Defendant was arrested on the same night at his home in Fairmead, California, by Detective Sergeant Tabler and several other officers of the Fresno County Sheriff's office. The officers advised defendant of his constitutional rights and searched the premises and defendant's automobile. Traces of blood were found on defendant's shoes, and blood tracings were found in the interior of his automobile. Then, Sergeant Tabler asked defendant if he had a jacket with a fur-lined collar. Defendant turned to his wife and queried, "I don't have one like that, do I dear?" His wife fainted.

Defendant was examined on the following day by Dr. Thomas Clinton Nelson. The doctor reported that there were scratch marks on defendant's

nose and neck, and they appeared to be "several days old." He opined that the marks were caused by fingernail wounds.

At the trial, Virgil Phillips testified that he saw defendant in the Olympia House on March 18, 1967. Phillips said that defendant was seated at the bar with Verda Ribble and Marjorie Wiser, and that as he (Phillips) left the bar the trio exited after him.

Marjorie Wiser testified that she was in the Chi Chi Club at approximately 4 or 4:30 p.m. and observed both Verda Ribble and defendant at the bar at that time. She denied being in the Olympia House that night or being with defendant and Verda Ribble.

Defendant was also seen in the Chi Chi Club by one Doris Ford. Miss Ford had known defendant for many years. She said that when she saw him in the club he was wearing a coat with a fur-lined collar.

Glenn Ford (no relation to Doris Ford) testified that he was the tow truck operator who pulled defendant's car from the ditch in which it was stuck. He said that while he was pulling the car out of the ditch, Deputy Sheriff Robert Bowling arrived at the scene and noted the license number of the automobile. Ford recalled that prior to arrival of the deputy sheriff, defendant had been "joking and cutting up" but after the officer's appearance, he became very quiet.

Defendant took the stand in his own defense and testified in great detail as to his activities on March 18, 1967. He said that he visited one bar after another, arriving at the A & J Bar just outside of Kerman, California, at around 6 p.m. After leaving the A & J Bar, defendant drove toward Fresno on Whitesbridge Road and turned north on Grantland Avenue. He proceeded north on Grantland Avenue to a small bar on Shields Avenue and stopped for only five to ten minutes, as he "didn't like the looks of the crowd." From there he proceeded north on Grantland, intending to turn on Shaw in an attempt to find a friend who frequented a bar in that area. Defendant missed Shaw, despite a blinking red stop light, and attempted to turn around in the access road in which he became stuck. He decided to relieve himself, and during the process bumped into the limb of a tree, scraping his face and causing it to bleed. Defendant explained that the blood found in his car came from his injured daughter; this testimony was corroborated by his father-in-law. Defendant also explained that he got the blood on his shoe when he picked up a dead dog to bury it. He claimed that he was not in the downtown area or the bars in that area on March 18.

## The Expert Testimony

Defendant attacks the testimony of Dr. Bryant Rees, an entomologist at Fresno State College, who, at the request of the pathologist, examined the larvae found on Verda Ribble's body in order to fix the time of her death. Briefly, he testified that the larvae were of the black blow fly, that these blow fly larvae pass through three "instars" or larvael stages, and that he was able to determine their exact stage of development when removed from the body. He also explained that the minimum growth period for the larvae between inception and maturity (at 99 degrees temperature) is four days, and the maximum period (at 58 degrees temperature) is fifteen days, and that by applying a series of averages or norms, he concluded that the eggs had been laid about three and one-half days before the body was discovered.

Defendant does not dispute the People's right to establish the time of death of the murder victim through expert testimony. The law on this subject is firmly settled, and prolonged discussion would serve no useful purpose. Moreover, he does not challenge Dr. Rees' expertise in ento- ▮▮ Defendant contends, however, that the doctor's use of averages in determining the age of the larvae substituted mathematical probability for relevant evidence as the foundation of his opinion, contrary to the rationale of *People* v. *Collins,* 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33].

▮ It is fundamental that a trial judge has wide discretion to admit or reject opinion evidence, and that a court of appeal has no power to interfere with the ruling unless there is an obvious and pronounced abuse of discretion on his part (*Kennedy* v. *Reece,* 240 Cal.App.2d 769 [49 Cal.Rptr. 915]). ▮ We find no abuse of discretion in this case. Dr. Rees, through accepted scientific methods, was able to ascertain the exact stage of development of the larvae found on Miss Ribble's body, and although he admitted that he did not use actual climatological conditions to determine when the eggs were laid, and that such conditions can vary the growth rate of the larvae, he also explained that this was not an important factor in this case. The larvae were found on a human body, a micro-environmental condition, and the growth rate of larvae is influenced mainly by micro-environmental conditions rather than macro-environmental conditions. In short, when Dr. Rees' testimony is considered as a whole, it is apparent that his opinion is reasonably accurate from a scientific standpoint and that his use of norms or averages went to the weight of the opinion, not to its admissibility. And, since the jury was accurately instructed in this respect, defendant cannot be heard to complain in this appeal. The case of *People* v. *Collins, supra,* is clearly distinguishable, and no further comment is necessary.

In any event, Verda Ribble disappeared on the night of March 18, and although the pathologist could not fix the exact time of death, he determined that she had been dead at least two days when her body was discovered. Thus, it is reasonably certain that Miss Ribble was killed on the night of March 18, as the prosecution theorized, and thus, it is hardly likely that the jury was unduly influenced by Dr. Rees' opinion.

## PRIOR OFFENSES

The second assignment of error is directed at the People's evidence (admitted over objection) that defendant committed acts of rape, attempted rape and fellatio on four other unwilling victims. The first victim came in contact with defendant in a bar-restaurant in January 1950. She said that he offered to drive her home, but instead drove her to the San Joaquin River where he forced her to have sexual intercourse with him. He also forced her to orally copulate him. The second victim met defendant in a bar sometime in 1957 and accepted his offer to drive her home because it was raining. She testified that he drove the automobile toward the country, stopped under the Madera River Bridge and raped her. The third victim met defendant at a bar in March 1966 and, like the others, accepted his offer to take her home. She said the defendant drove his car into an orchard and forced her into an act of sexual intercourse. The fourth victim met defendant in a cocktail lounge in September of 1966. She offered to take defendant and some friends to a restaurant to eat, and defendant accepted the offer. She stated that when her friends did not come out to the car, she told defendant that she had changed her mind, but he refused to get out of the car and told her that they were going to the country. Later, when she stopped her car in front of a friend's home, defendant attempted to remove her clothing. He also pulled her head forward and opened his pants. She eventually managed to kick the car door open and get away.

While evidence that a defendant committed other crimes is not admissible to prove that he is disposed to commit crime (*People* v. *Cook,* 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass,* 158 Cal. 650, 655 [112 P. 281], such evidence is admissible to prove some other relevant fact (*People* v. *Lopez,* 60 Cal.2d 223, 249 [32 Cal.Rptr. 424, 384 P.2d 16]). It is admissible, for example, to prove specific intent, knowledge or motive (*People* v. *Lapierre,* 205 Cal. 462 [271 P. 497]; *People* v. *David,* 12 Cal.2d 639 [86 P.2d 811]; *People* v. *Gonzales,* 87 Cal.App.2d 867 [198 P.2d 81]). When a primary issue of fact is whether the defendant, rather than some other person, committed the crime charged, evidence that he committed other similar crimes is admissible to establish his identity as the perpetrator of the crime charged (*People* v. *Roach,* 148 Cal.App.2d 364, 368 [306 P.2d 523]). But, because evidence of other crimes is highly

prejudicial, it should be admitted on the issue of a defendant's identity only ". . . when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*People* v. *Haston,* 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].)

■ The prior offenses which defendant committed on four other women were sufficiently similar to each other and to the crime for which defendant was being tried to prove a common scheme, plan or modus operandi, and hence to establish his identity as the perpetrator of the latter crime. According to the People's evidence, defendant met Verda Ribble in a bar, somehow inveigled her into his automobile, drove her to a remote spot in the country and obviously raped, or attempted to rape, her before he killed her. Defendant met all four of his other victims in bars. He told three of the victims that he would drive them home in his automobile and instead drove them to a remote spot in the country and raped them; defendant tried to force the fourth victim to drive her car to the country, and when she stopped the vehicle he tried to rape her. In addition, because motive is always relevant in a criminal prosecution (*People* v. *Lapierre, supra,* 205 Cal. 462; *People* v. *Gonzales, supra,* 87 Cal.App.2d 867), the offenses were also admissible to prove that defendant's motive for slaying Verda Ribble was rape or attempted rape.

### The *Johnson* Error

■ After the People's witness, Marjorie Wiser, denied being at the Olympia House on the night of March 18, 1967, or that she was with defendant and Verda Ribble on that night, the prosecutor requested leave of the court to impeach her under section 785 of the California Evidence Code. Permission was granted. The prosecutor then called Mrs. Caldwell, and she testified that Mrs. Wiser had made the statement to which the prosecution had alluded. Afterward, the following transpired:

"MR. KEYES: (the prosecutor) Before the next witness, your Honor, I would request that the court instruct the jury that under Evidence Code 1235 that this evidence is not being offered merely for the impeachment purpose, but also introduced as substantive and for the truth of the matter for them to consider—

"MR. CARTER: If the court please, now that counsel has carefully instructed the jury along that line, we would object to any such instruction by

the court because the usual rule is for the court to instruct the jury as to the limitations of evidence. Otherwise, all evidence is in for all purposes.

"THE COURT: The jury will remember that evidence is given for all purposes unless the court instructs the jury to the contrary."

Manifestly, Marjorie Wiser's extrajudicial statements were not limited to impeachment, but were used as substantive evidence under Evidence Code section 1235, contrary to the Supreme Court's pronouncement that the section was unconstitutional because it impinges upon a defendant's Sixth Amendment right of confrontation (*People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]). Moreover, because defendant's trial was completed before the *Johnson* opinion was filed, the error was not waived by defendant's failure to request a limiting instruction or admonition; a defendant is not deemed to have waived a substantial constitutional right by his failure to perform what appears to be a fruitless or idle act (*People* v. *Vinson,* 268 Cal.App.2d 672, 675 [74 Cal.Rptr. 340]); nor was the error cured by the standard instruction which tells the jury that they can consider prior inconsistent statements of a witness in judging the witness' credibility (*People* v. *Odom,* 71 Cal.2d 709, 714 [78 Cal. Rptr. 873, 456 P.2d 145]).

██ Nevertheless, the error does not require a reversal of the judgment (*Chapman* v. *State of California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]). In fact, it stretches credulity to believe that the jury would have reached a different verdict if the judge had instructed them to consider Mrs. Wiser's contradictory statements for impeachment purposes only.

First, defendant denied being in downtown Fresno on March 18, 1967, but he was seen in the Chi Chi Club by Marjorie Wiser and Doris Ford; Mrs. Ford stated that defendant was wearing a coat with a fur-lined collar; Mrs. Wiser said that Verda Ribble and defendant were in the club at the same time. Defendant was also seen in the Olympia House by Virgil Phillips; he was seated at the bar with Verda Ribble and Marjorie Wiser, and Phillips saw them leave together. While Phillips admitted that he had been drinking heavily that evening, he emphatically stated that he was not drunk when he observed the three people; his testimony is credible because defendant was seen in the downtown area by the two other witnesses.

Second, Verda Ribble disappeared sometime on the evening of March 18, and her body was found several days later in a fig orchard within the

vicinity of Shaw and Grantland Avenues. The evidence is practically un-contradicted that defendant was in that vicinity on the same evening; his automobile was stuck in a ditch alongside an access road leading to the very orchard in which the victim's body was found; a shoe track found near the body could not be excluded as having been made by defendant's shoe; a hair found under the victim's ring could not be excluded as be-longing to defendant.

Third, when defendant walked up to the front door of the Silva house-hold and asked for help, he had blood on his face from a cut or scratch on his nose, appeared to be nervous and refused an invitation to come in and wash up. Later, the Beacon service station attendant noticed that defendant had been bleeding and that he had a scratch on his nose and one on his neck. Shortly after defendant was arrested he was examined by a doctor, and the doctor opined that the scratches on defendant's nose and neck were several days old and were caused by fingernail wounds.

Fourth, the tow truck operator who pulled defendant's car from the ditch testified that before a deputy sheriff arrived at the scene, defendant had been "joking and cutting up" but afterward he became very quiet.

Fifth, Verda Ribble was seen leaving the bar with defendant, and she was murdered in a fig orchard by someone who attempted to rape her; her underclothes had been removed and were found strewn around the body. Defendant had a past history of picking up women at bars, driving them to remote spots in the country, and committing forceable rape or acts of perversion.

### DEFENDANT'S REMAINING CONTENTIONS

Defendant's remaining contentions are of no consequence and need not detain us long. ■ He complains because the court allowed Sergeant Tabler to testify that when he asked defendant if he had a jacket with a fur-lined collar, defendant turned to his wife and stated, "I don't have one like that, do I dear," and his wife fainted. The reaction of defendant's wife to this question was relevant to prove that defendant owned a coat with a fur-lined collar and that he had worn it on the night of the murder; and because it was nonassertive conduct it was not objectionable hearsay (Evid. Code, §§ 225, 1200). Furthermore, defendant was seen wearing such a coat on March 18 by many unbiased witnesses. ■ Defendant also complains because the court refused to admit into evidence a paper napkin found in the victim's purse which contained the words "Yosemite, Room 9" to prove that the occupant of that room may have been the murderer. But,

there was absolutely no other evidence to connect the victim with the occupant of room 9 on the night of the murder.

The judgment is affirmed.

Stone, P. J., and Coakley, J., concurred.