Filed 6/24/14  P. v. Bengoa CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EDGAR JAVIER BENGOA,<br><br>    Defendant and Appellant. | G048244<br><br>(Super. Ct. No. 10NF1581)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

        Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Heather M. Clark, Deputy Attorney General, for Plaintiff and Respondent.

Edgar Javier Bengoa appeals from the judgment following his conviction on two counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c); all further statutory references are to this code) and one count of street terrorism (§ 186.22, subd. (a).) The information also alleged various sentencing enhancements, including that defendant committed the robbery in count 1 for the benefit or in association with a criminal street gang, and that during the commission of that crime, a principal discharged a firearm, causing great bodily injury. (§ 12022.53, subds. (d) and (e)(1).) Defendant was sentenced to a total term of 28 years to life, consisting of the low end term of two years on the first robbery count, plus a consecutive term of 25 years to life for the firearm enhancement, and a consecutive one-year term for the second robbery count. The court stayed the sentence on the street terrorism count pursuant to section 654.

Defendant contends his convictions must be reversed because the trial court erroneously instructed the jury it could find him guilty of the robberies on alternative theories, one of which was his participation in an uncharged conspiracy to commit the offenses. According to defendant, conspiracy is solely a substantive offense under California law and does not constitute an appropriate basis for imposing derivative liability for other charged offenses. We reject the contention because defendant has misconstrued how the alleged conspiracy was used to establish his guilt in this case. Our Supreme Court has repeatedly stated, most recently in 2012, that a defendant's participation in a conspiracy to commit an uncharged target crime is an appropriate basis for imposing derivative liability for other crimes which were a natural and probable consequence of that target crime. (*People v. Valdez* (2012) 55 Cal.4th 82, 153-154.) That is what occurred here.

Defendant also challenges his sentence, arguing: (1) the 25 year firearm enhancement, imposed on the basis that defendant aided and abetted a shooting for the benefit of a "criminal street gang," violates equal protection; and (2) because he is a juvenile, his final sentence of 28 years to life qualifies as cruel and unusual punishment.

2

Neither contention is persuasive.  The Legislature made a rational decision to impose severe punishment on members of criminal street gangs who aid and abet gun violence, and we cannot conclude that decision violates equal protection.  We reject defendant's claim that his sentence qualifies as cruel and unusual punishment because the sentence does offer him the opportunity for parole when he is in his 40's, and thus it does not qualify as the "functional equivalent" of a sentence imposing a life term without the possibility of parole.

The judgment is affirmed.

FACTS

The charges against defendant arose from the armed robbery of a couple, the Alvarados.  Two Hispanic men approached the Alvarados' car, one on each side, and opened the car doors.  The man on the driver's side displayed a revolver.  Both men took items from the couple, and the man on the driver's side demanded Mr. Alvarado open the car's trunk where he had claimed his wallet was located.  When Alvarado got out of the car to open the trunk, he believed the man next to him was preparing to use the gun and so punched him.  The man responded by shooting Alvarado in the arm.  Both robbers then fled the scene, taking cash and several items belonging to the couple.

Three days later, defendant and another male, Salome Orellana-Pineda, were stopped by a police officer who believed they matched the description of the two Alvarado robbers.  A search revealed Orellana-Pineda was in possession of items stolen from the Alvarados, and both he and defendant were subsequently arrested.

While he was incarcerated prior to trial, defendant became acquainted with another inmate and boasted to him about the robbery.  Defendant claimed that it was he who had shot Alvarado, after Alvarado punched him.  He also told the other inmate that

3

he was in a gang called "Daily Smoking Weed" or DSW and that he was "putting in work" for the gang.

At trial, the prosecution's theory of the case was that defendant had, at a minimum, aided and abetted the crime of theft; that during the commission of that planned crime, a coparticipant committed the crimes of robbery and assault with a firearm; and that a reasonable person in defendant's position would have known that the robbery and assault with a firearm was a natural and probable consequence of the intended theft. The jury was instructed that a "coparticipant" in the theft can be either the direct perpetrator of that crime or an aider and abettor.

The jury was also instructed on the elements of a conspiracy and that the prosecution's contention was that defendant had participated in a conspiracy to commit theft. The jury was also told that a member of a criminal conspiracy is responsible for both the crimes he conspires to commit and for any additional criminal act committed by a member of the conspiracy if the act is "done to further the conspiracy" and was "a natural and probable consequence of the common plan or design of the conspiracy."

Alternatively, the jury was instructed it could find defendant guilty of robbery and assault with a firearm if it simply concluded he had been the direct perpetrator of those crimes, or if it determined he had aided and abetted in their commission.

The jury found defendant guilty on the two robbery counts and on the count charging street terrorism, but found him not guilty on the count charging assault with a firearm.

4

DISCUSSION

*1. Uncharged Conspiracy as a Basis for Derivative Liability*

Defendant first challenges his robbery convictions, arguing the court improperly instructed the jury it could rely on evidence of his participation in an uncharged conspiracy as one of three distinct theories establishing his derivative liability for the charged crimes of robbery and assault with a firearm. In defendant's view, the court treated his alleged participation in a conspiracy to commit *the charged crimes* as an alternative to theories of aiding and abetting and the natural and probable consequences doctrine, as a means of holding him criminally responsible for those crimes. Specifically, he asserts "[t]he court told the jury it could find appellant guilty if (1) he personally perpetrated those offenses, (2) he aided and abetted in the commission of those offenses, (3) [those offenses were] the natural and probable consequences of aiding and abetting liability[,] or (4) [he participated in] an uncharged conspiracy to commit those offenses."

Defendant contends the court erred by instructing the jury in this fashion, because while "the Penal Code discusses conspiracy to commit a crime . . . , it defines conspiracy as a substantive offense; it does not recognize conspiracy as a theory of vicarious liability for a criminal act." Defendant then argues that reliance on his participation in an uncharged conspiracy as a means of establishing his guilt on the substantive crimes violates section 31, which he characterizes as establishing that only persons who directly perpetrate a crime and those who aid and abet in its commission can be found guilty as principals. Mere conspirators in the crime would not qualify.

Defendant's argument suffers from two significant flaws. First, as defendant concedes, "there has arisen a body of case law that says conspirators are principals in any crime committed by a member of the conspiracy in furtherance of that conspiracy." While we might quibble with defendant's characterization of that rule – the crimes committed must also be a natural and probable consequence of the conspiracy –

5

the "body of case law" defendant refers to has been largely produced by our Supreme Court (see, e.g., *People v. Prieto* (2003) 30 Cal.4th 226, 249-250 ["the instructions correctly informed the jury that a conspirator may be vicariously liable for a crime committed in furtherance of a conspiracy only if that crime was a natural and probable consequence of the conspiracy"]), and we are bound by it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In any event, the Supreme Court's rule treating conspirators as principals in the crimes they have conspired to commit does not, as defendant suggests, conflict with the strictures of section 31. As defendant himself acknowledges, our Supreme Court has long since held that while not all aiders and abettors are necessarily conspirators (*People v. Durham* (1969) 70 Cal.2d. 171, 181 ["'[o]ne may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it'"] (italics omitted)), all conspirators in a crime *do qualify as aiders and abettors*. (*Id*. at p. 180, fn. 7 ["the prosecution properly seeks to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission"]; *People v. Lapierre* (1928) 205 Cal. 462, 471["this is not a prosecution for conspiracy, *the existence of the conspiracy showing only that appellant aided and abetted the commission of the crime*"] (italics added).)

Thus, if we were to assume (as defendant apparently believes) that the instructions in this case invited the jury to conclude he was guilty of the charged robberies based solely on a determination he conspired to commit *those crimes*, then the alleged conspiracy would have merely operated as an alternative means of establishing his guilt *as an aider and abettor* of the robberies. And because aiding and abetting is an established basis for holding a defendant guilty as a principal under section 31, defendant would have no basis to complain of that.

However, the second flaw in defendant's argument is that he misstates the role played by the alleged conspiracy in the jury's determination of his guilt. In fact, the

6

court did not instruct the jury that defendant could be found guilty of robbery based on four distinct theories, one of which was his participation in a conspiracy *to commit robbery*. Instead, what the court instructed the jury was that "[a] person may be guilty of a crime in *two ways*. One, he or she may have directly committed the crime. . . . Two, he or she may have aided and abetted a perpetrator, who directly committed the crime." (Italics added.) That instruction is entirely consistent with defendant's main premise.

And the court then explained to the jury that other circumstances might be relied upon to establish defendant's liability as an aider and abettor: Specifically, the court instructed the jury that "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of *one crime*, a person may also be found guilty *of other crimes* that occurred during the commission of the first crime." (Italics added.)

The "specified circumstances" referred to – under which an aider and abettor of *one crime* can be found guilty of *other crimes* – were then revealed to be those comprising the natural and probable consequences doctrine and the uncharged conspiracy. Thus, those two theories were not proposed as separate and distinct justifications for holding defendant responsible for the charged robberies; instead, they were posited only as support for finding defendant guilty of the robberies *as an aider and abettor*. The court's instructions told the jury that defendant could be found guilty of robbery under the natural and probable consequences doctrine if the prosecution established (1) defendant was guilty *of theft*, (2) during the commission of that theft, a coparticipant committed the robbery, and (3) a reasonable person in defendant's position would have known that *the robbery* was a natural and probable consequence of the theft. This was proper. (*People v. Medina* (2009) 46 Cal.4th 913, 920 ["'[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime'"].) The instructions also told the jury that if it found defendant had participated in *a conspiracy to commit*

7

*theft*, defendant could then be found guilty *of robbery* if that robbery was committed by one of his coconspirators in furtherance of the theft conspiracy *and* the robbery was found to be a natural and probable consequence of the planned theft.

That use of an uncharged conspiracy – to establish defendant's complicity in an uncharged "target crime" which in turn was found to have precipitated the charged crime as a natural and probable consequence – is well established as a basis for extending a defendant's liability *as an aider and abettor*, to the charged crime.  (*People v. Prieto, supra*, 30 Cal.4th at pp. 249-250.)  Consequently, we conclude there was no error in these instructions.


*2. Firearm Enhancement*

Defendant also challenges the sentence imposed against him, arguing that section 12022.53, subdivision (e) (hereinafter § 12022.53(e)(1)), violates constitutional guarantees of equal protection.  Section 12022.53(e)(1) requires that an additional term of 25 years to life be imposed against any defendant who aids and abets certain crimes in which a principal discharges a firearm, if that defendant participated in the crime in violation of section 186.22, subdivision (b) – i.e., for the benefit of a criminal street gang and with the intent to promote criminal conduct by gang members.  In defendant's view, this provision unfairly singles out criminal street gang members for harsh treatment, because they are not differently situated from those persons who aid and abet shootings committed for the benefit of *other* "criminal organizations or groups not specifically defined as 'criminal street gangs.'"

Defendant contends that the constitutionality of section 12022.53(e)(1) must be subjected to strict scrutiny because it abridges the fundamental liberty interests of street gang members, and can be upheld "only if it is found necessary to further a compelling state interest."  (Citing *People v. Olivas* (1976) 17 Cal.3d 236, 251.)  We are unpersuaded by defendant's argument.  The concept of equal protection recognizes that

8

persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Thus, "'[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'" (*Ibid.*)

Here, defendant has failed to make that initial showing. By simply equating all persons who aid and abet shootings committed for the benefit of a criminal organization or group, defendant misses the attribute that distinguishes the aider and abettor who "violated subdivision (b) of Section 186.22." (§ 12022.53(e)(1)(A).) As defendant himself acknowledges, our Supreme Court has already determined that section 186.22, which underlies the imposition of the increased penalty, does not punish mere membership in a criminal street gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 623-624.) Instead, as the court explained, the statute is part of the "California Street Terrorism Enforcement and Prevention Act" – i.e., the "STEP Act." Section 186.20 et seq., which "imposes increased criminal penalties only when the criminal conduct is felonious *and* [is] committed . . . '*for the benefit of*, at the direction of, or in association with' a group that meets the specific statutory conditions of *a 'criminal street gang.'*" (*People v. Gardeley, supra,* 14 Cal.4th at p. 623, italics added.)

What distinguishes "criminal street gangs" governed by the STEP Act from other criminal groups is their reliance on a pattern of signature crimes for the purpose of promoting the gang's criminal *reputation*. The criminal street gangs governed by the STEP Act engage in crimes not only for the usual prosaic reasons (e.g., money), but also for the purpose of instilling what they might characterize as "respect" for – and we would characterize as *fear of* – the gang itself. As explained by our Supreme Court in *People v. Albillar* (2010) 51 Cal.4th 47, 63, "[e]xpert opinion that particular criminal conduct

9

benefited a gang by *enhancing its reputation for viciousness* can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang.'" (Italics added.) (See also *People v. Hill* (2011) 191 Cal.App.4th 1104, 1112 [evidence that "crimes *enhance the gang's reputation* and benefit it monetarily" supported a determination that the gang qualified as a criminal street gang for purposes of the statute] italics added.)

Thus, these gangs do not, in the way of other criminal enterprises, endeavor to distance themselves from their criminal exploits. That is the point which eludes defendant as he asserts that singling out criminal street gangs on the basis that they have "a common name or common identifying symbol" is arbitrary. (See § 186.22, subd. (f).) It is not. The point is to single out gangs that commit crimes with the specific goal of enhancing the gang's *group identity* – thus generating fear and terror of the gang, both among other gangs and within the wider community. Having that goal means these gangs will commit crimes where other criminal groups might refrain from doing so. It is the desire to instill fear and terrorize others which makes these groups more volatile and dangerous than an ordinary criminal enterprise.

Moreover, the group identity forged by these gangs – as evidenced by their common name or identifying symbol – means *the group itself* has a criminal existence which is separate and distinct from the exploits of any single member. Giving the group a distinct identity allows it to endure as a criminal enterprise, recruiting new members as its original members depart. For this reason as well, the "criminal street gangs" defined in the STEP Act are distinguishable from undefined, ad hoc criminal organizations which do not forge these enduring criminal identities.

And because the criminal street gangs governed by the STEP Act are distinguished by these significant characteristics, the people who choose to join them, and to commit crimes for their benefit, are not similarly situated to others who merely commit their crimes as part a more informal, ad hoc group. Consequently, we reject defendant's

10

claim that the increased penalty imposed upon him, based upon the use of a gun during robberies committed for the benefit of a criminal street gang, violated constitutional guarantees of equal protection.

*3.  Cruel and Unusual Punishment*

Defendant's final contention is that the sentence imposed upon him, a total of 28 years to life, constituted cruel and unusual punishment.  Defendant relies upon *People v. Dillon* (1983) 34 Cal.3d 441 and *People v. Lynch* (1972) 8 Cal.3d 410 in arguing his sentence is "'disproportionate to the offense for which it is imposed'" based upon an evaluation of "the nature of the offense, the nature of the offender, the danger of the offense, and the danger of the offender."

Defendant concedes that armed robbery – especially, as here, when a gun was actually discharged – is a very serious offense.  He also acknowledges that when such a crime is "motivated by gang animus," it is "in the abstract . . . deserving of harsh punishment."  But he claims nonetheless that his punishment is unduly harsh because (a) he did not *personally* discharge the firearm, and (b) he is a juvenile.

We are not persuaded.  As to the first point, it has long been a staple of our jurisprudence that aiders and abettors are held fully culpable for the crimes they intend to aid and abet or which are a natural and probable consequence of a crime they intended.  "[A]n aider and abettor 'shares the guilt of the actual perpetrator." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122.)  And while defendant seeks to minimize his involvement in the robberies, we note the evidence reflects that defendant later told a fellow inmate that he *personally* fired the gun.  Moreover, defendant otherwise conceded he was at least aware that Orellana-Pineda had a gun on the night of the robberies.  In light of that concession, defendant cannot persuasively assert it would be *unfair* to subject him to the additional 25 years to life term which is *mandated by statute* for one who participates in a

11

gang crime involving the discharge of a firearm. And as that mandatory 25 years to life term comprises the vast majority of his total sentence, his first point fails.

Defendant's second point focuses on his youth at the time of the robberies. He seems to argue that sentencing a juvenile offender to a term of 28 years to life is tantamount to sentencing him to a term of life *without parole*, because "[t]here is no guarantee . . . that he will be paroled" when he becomes eligible. The contention is unsupported by any authority and simply flies in the face of recent cases which conclude that it is the *possibility* of parole within the juvenile's reasonable life expectancy – i.e., an "opportunity to 'demonstrate growth and maturity' to try to secure his release" (*People v. Caballero* (2012) 55 Cal.4th 262, 268) – that saves a sentence from constitutional infirmity. Defendant's sentence, which he acknowledges will render him eligible for parole when he is in his mid-40's, meets that standard.

## DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

MOORE, J.

12